(Slip Opinion) OCTOBER TERM, 2019 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## THOLE ET AL. *v.* U. S. BANK N. A. ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 17–1712. Argued January 13, 2020—Decided June 1, 2020

Plaintiffs James Thole and Sherry Smith are retired participants in U. S. Bank's defined-benefit retirement plan, which guarantees them a fixed payment each month regardless of the plan's value or its fiduciaries' good or bad investment decisions. Both have been paid all of their monthly pension benefits so far and are legally and contractually entitled to those payments for the rest of their lives. Nevertheless, they filed a putative class-action suit against U. S. Bank and others (collectively, U. S. Bank) under the Employee Retirement Income Security Act of 1974 (ERISA), alleging that the defendants violated ERISA's duties of loyalty and prudence by poorly investing the plan's assets. They request the repayment of approximately $750 million to the plan in losses suffered due to mismanagement; injunctive relief, including replacement of the plan's fiduciaries; and attorney's fees. The District Court dismissed the case, and the Eighth Circuit affirmed on the ground that the plaintiffs lack statutory standing.

*Held*: Because Thole and Smith have no concrete stake in the lawsuit, they lack Article III standing. See *Lujan* v. *Defenders of Wildlife,* 504 U. S. 555, 560–561. Win or lose, they would still receive the exact same monthly benefits they are already entitled to receive.

    None of the plaintiffs' arguments suffices to establish Article III standing. First, the plaintiffs rely on a trust analogy in arguing that an ERISA participant has an equitable or property interest in the plan and that injuries to the plan are therefore injuries to the participants. But participants in a defined-benefit plan are not similarly situated to the beneficiaries of a private trust or to participants in a defined-contribution plan, and they possess no equitable or property interest in the plan, see *Hughes Aircraft Co.* v. *Jacobson*, 525 U. S. 432, 439–441. Second, the plaintiffs cannot assert representative standing based on

injuries to the plan where they themselves have not "suffered an injury in fact," *Hollingsworth* v. *Perry,* 570 U. S. 693, 708, or been legally or contractually appointed to represent the plan. Third, the fact that ERISA affords all participants—including defined-benefit plan participants—a cause of action to sue does not satisfy the injury-in-fact requirement here. "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc.* v. *Robins*, 578 U. S. ___, ___. Fourth, the plaintiffs contend that meaningful regulation of plan fiduciaries is possible only if they may sue to target perceived fiduciary misconduct. But this Court has long rejected that argument for Article III standing, see *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 489, and defined-benefit plans are regulated and monitored in multiple ways.

The plaintiffs' *amici* assert that defined-benefit plan participants have standing to sue if the plan's mismanagement was so egregious that it substantially increased the risk that the plan and the employer would fail and be unable to pay the participants' future benefits. The plaintiffs do not assert that theory of standing here, nor did their complaint allege that level of mismanagement. Pp. 2–8.

873 F. 3d 617, affirmed.

KAVANAUGH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, and GORSUCH, JJ., joined. THOMAS, J., filed a concurring opinion, in which GORSUCH, J., joined. SOTOMAYOR, J., filed a dissenting opinion, in which GINSBURG, BREYER, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 17–1712

JAMES J. THOLE, ET AL., PETITIONERS *v.*
U. S. BANK N. A., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE EIGHTH CIRCUIT

[June 1, 2020]

JUSTICE KAVANAUGH delivered the opinion of the Court.

To establish standing under Article III of the Constitution, a plaintiff must demonstrate (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief.  See *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560–561 (1992).

Plaintiffs James Thole and Sherry Smith are two retired participants in U. S. Bank's retirement plan.  Of decisive importance to this case, the plaintiffs' retirement plan is a defined-benefit plan, not a defined-contribution plan.  In a defined-benefit plan, retirees receive a fixed payment each month, and the payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions.  By contrast, in a defined-contribution plan, such as a 401(k) plan, the retirees' benefits are typically tied to the value of their accounts, and the benefits can turn on the plan fiduciaries' particular investment decisions.  See *Beck* v. *PACE Int'l Union*, 551 U. S. 96, 98 (2007); *Hughes Aircraft Co.* v. *Jacobson*, 525 U. S. 432, 439–

440 (1999).

As retirees and vested participants in U. S. Bank's de-fined-benefit plan, Thole receives $2,198.38 per month, and Smith receives $42.26 per month, regardless of the plan's value at any one moment and regardless of the investment decisions of the plan's fiduciaries. Thole and Smith have been paid all of their monthly pension benefits so far, and they are legally and contractually entitled to receive those same monthly payments for the rest of their lives.

Even though the plaintiffs have not sustained any mone-tary injury, they filed a putative class-action suit against U. S. Bank and others (collectively, U. S. Bank) for alleged mismanagement of the defined-benefit plan. The alleged mismanagement occurred more than a decade ago, from 2007 to 2010. The plaintiffs sued under ERISA, the aptly named Employee Retirement Income Security Act of 1974, 88 Stat. 829, as amended, 29 U. S. C. §1001 *et seq.* The plaintiffs claimed that the defendants violated ERISA's du-ties of loyalty and prudence by poorly investing the assets of the plan. The plaintiffs requested that U. S. Bank repay the plan approximately $750 million in losses that the plan allegedly suffered. The plaintiffs also asked for injunctive relief, including replacement of the plan's fiduciaries. See ERISA §§502(a)(2), (3), 29 U. S. C. §§1132(a)(2), (3).

No small thing, the plaintiffs also sought attorney's fees. In the District Court, the plaintiffs' attorneys requested at least $31 million in attorney's fees.

The U. S. District Court for the District of Minnesota dis-missed the case, and the U. S. Court of Appeals for the Eighth Circuit affirmed on the ground that the plaintiffs lack statutory standing. 873 F. 3d 617 (2017). We granted certiorari. 588 U. S. ___ (2019).

We affirm the judgment of the U. S. Court of Appeals for the Eighth Circuit on the ground that the plaintiffs lack Ar-ticle III standing. Thole and Smith have received all of their monthly benefit payments so far, and the outcome of

this suit would not affect their future benefit payments. If Thole and Smith were to *lose* this lawsuit, they would still receive the exact same monthly benefits that they are already slated to receive, not a penny less. If Thole and Smith were to *win* this lawsuit, they would still receive the exact same monthly benefits that they are already slated to receive, not a penny more. The plaintiffs therefore have no concrete stake in this lawsuit. To be sure, their attorneys have a stake in the lawsuit, but an "interest in attorney's fees is, of course, insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim." *Lewis* v. *Continental Bank Corp.*, 494 U. S. 472, 480 (1990); see *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 107 (1998) (same). Because the plaintiffs themselves have no concrete stake in the lawsuit, they lack Article III standing.

\*    \*    \*

If Thole and Smith had not received their vested pension benefits, they would of course have Article III standing to sue and a cause of action under ERISA §502(a)(1)(B) to recover the benefits due to them. See 29 U. S. C. §1132(a)(1)(B). But Thole and Smith have received all of their monthly pension benefits so far, and they will receive those same monthly payments for the rest of their lives.

To nonetheless try to demonstrate their standing to challenge alleged plan mismanagement, the plaintiffs have advanced four alternative arguments.

*First*, analogizing to trust law, Thole and Smith contend that an ERISA defined-benefit plan participant possesses an equitable or property interest in the plan, meaning in essence that injuries to the plan are by definition injuries to the plan participants. Thole and Smith contend, in other words, that a plan fiduciary's breach of a trust-law duty of prudence or duty of loyalty itself harms ERISA defined-benefit plan participants, even if the participants themselves

have not suffered (and will not suffer) any monetary losses.

The basic flaw in the plaintiffs' trust-based theory of standing is that the participants in a defined-benefit plan are not similarly situated to the beneficiaries of a private trust or to the participants in a defined-contribution plan. See *Varity Corp.* v. *Howe*, 516 U. S. 489, 497 (1996) (trust law informs but does not control interpretation of ERISA). In the private trust context, the value of the trust property and the ultimate amount of money received by the beneficiaries will typically depend on how well the trust is managed, so every penny of gain or loss is at the beneficiaries' risk. By contrast, a defined-benefit plan is more in the nature of a contract. The plan participants' benefits are fixed and will not change, regardless of how well or poorly the plan is managed. The benefits paid to the participants in a defined-benefit plan are not tied to the value of the plan. Moreover, the employer, not plan participants, receives any surplus left over after all of the benefits are paid; the employer, not plan participants, is on the hook for plan shortfalls. See *Beck*, 551 U. S., at 98–99. As this Court has stated before, plan participants possess no equitable or property interest in the plan. See *Hughes Aircraft Co.*, 525 U. S., at 439–441; see also *LaRue* v. *DeWolff, Boberg & Associates, Inc.*, 552 U. S. 248, 254–256 (2008). The trust-law analogy therefore does not fit this case and does not support Article III standing for plaintiffs who allege mismanagement of a defined-benefit plan.

*Second*, Thole and Smith assert standing as representatives of the plan itself. But in order to claim "the interests of others, the litigants themselves still must have suffered an injury in fact, thus giving" them "a sufficiently concrete interest in the outcome of the issue in dispute." *Hollingsworth* v. *Perry*, 570 U. S. 693, 708 (2013) (internal quotation marks omitted); cf. *Gollust* v. *Mendell*, 501 U. S. 115, 125–126 (1991) (suggesting that shareholder must "main-

tain some continuing financial stake in the litigation" in order to have Article III standing to bring an insider trading suit on behalf of the corporation); *Craig* v. *Boren*, 429 U. S. 190, 194–195 (1976) (vendor who "independently" suffered an Article III injury in fact could then assert the rights of her customers). The plaintiffs themselves do not have a concrete stake in this suit.

The plaintiffs point to the Court's decisions upholding the Article III standing of assignees—that is, where a party's right to sue has been legally or contractually assigned to another party. But here, the plan's claims have not been legally or contractually assigned to Thole or Smith. Cf. *Sprint Communications Co.* v. *APCC Services, Inc.*, 554 U. S. 269, 290 (2008); *Vermont Agency of Natural Resources* v. *United States ex rel. Stevens*, 529 U. S. 765, 771–774 (2000) (*qui tam* statute makes a relator a partial assignee and "gives the relator himself an interest in the lawsuit") (emphasis deleted). The plaintiffs' invocation of cases involving guardians, receivers, and executors falls short for basically the same reason. The plaintiffs have not been legally or contractually appointed to represent the plan.

*Third*, in arguing for standing, Thole and Smith stress that ERISA affords the Secretary of Labor, fiduciaries, beneficiaries, and participants—including participants in a defined-benefit plan—a general cause of action to sue for restoration of plan losses and other equitable relief. See ERISA §§502(a)(2), (3), 29 U. S. C. §§1132(a)(2), (3). But the cause of action does not affect the Article III standing analysis. This Court has rejected the argument that "a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Spokeo, Inc.* v. *Robins*, 578 U. S. \_\_\_, \_\_\_ (2016) (slip op., at 9); see *Raines* v. *Byrd*, 521 U. S. 811, 820, n. 3 (1997). The Court has emphasized that "Article III stand-

ing requires a concrete injury even in the context of a statutory violation." *Spokeo*, 578 U. S., at ___ (slip op., at 9). Here, the plaintiffs have failed to plausibly and clearly allege a concrete injury.[1]

*Fourth*, Thole and Smith contend that if defined-benefit plan participants may not sue to target perceived fiduciary misconduct, no one will meaningfully regulate plan fiduciaries. For that reason, the plaintiffs suggest that defined-benefit plan participants must have standing to sue. But this Court has long rejected that kind of argument for Article III standing. See *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 489 (1982) (the "'assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing'") (quoting *Schlesinger* v. *Reservists Comm. to Stop the War*, 418 U. S. 208, 227 (1974)).

In any event, the argument rests on a faulty premise in this case because defined-benefit plans are regulated and monitored in multiple ways. To begin with, employers and their shareholders often possess strong incentives to root out fiduciary misconduct because the employers are entitled to the plan surplus and are often on the hook for plan shortfalls. Therefore, about the last thing a rational employer wants or needs is a mismanaged retirement plan. Cf. ERISA §4062(a), 29 U. S. C. §1362(a). Moreover, ERISA expressly authorizes the Department of Labor to enforce ERISA's fiduciary obligations. See ERISA §502(a)(2), 29 U. S. C. §1132(a)(2). And the Department of Labor has a substantial motive to aggressively pursue fiduciary misconduct, particularly to avoid the financial burden of failed defined-benefit plans being backloaded onto the Federal Government. When a defined-benefit plan fails and is unable

-------------

[1] To be clear, our decision today does not concern suits to obtain plan information. See, *e.g.,* ERISA §502(a)(1)(A), 29 U. S. C. §1132(a)(1)(A).

to pay benefits to retirees, the federal Pension Benefit Guaranty Corporation is required by law to pay the vested pension benefits of the retirees, often in full. The Department of Labor is well positioned to understand the relationship between plan failure and the PBGC because, by law, the PBGC operates within the Department of Labor, and the Secretary of Labor chairs the Board of the PBGC. See ERISA §§4002(a), (d), 29 U. S. C. §§1302(a), (d). On top of all that, fiduciaries (including trustees who are fiduciaries) can sue other fiduciaries—and they would have good reason to sue if, as Thole and Smith posit, one fiduciary were using the plan's assets as a "personal piggybank." Brief for Petitioners 2. In addition, depending on the nature of the fiduciary misconduct, state and federal criminal laws may apply. See, *e.g.,* 18 U. S. C. §§664, 1954; ERISA §514(b)(4), 29 U. S. C. §1144(b)(4). In short, under ERISA, fiduciaries who manage defined-benefit plans face a regulatory phalanx.

In sum, none of the plaintiffs' four theories supports their Article III standing in this case.

One last wrinkle remains. According to the plaintiffs' *amici*, plan participants in a defined-benefit plan have standing to sue if the mismanagement of the plan was so egregious that it substantially increased the risk that the plan and the employer would fail and be unable to pay the participants' future pension benefits. Cf. *Clapper* v. *Amnesty Int'l USA*, 568 U. S. 398, 414, n. 5 (2013); *Lee* v. *Verizon Communications*, *Inc.*, 837 F. 3d 523, 545–546 (CA5 2016); *David* v. *Alphin*, 704 F. 3d 327, 336–338 (CA4 2013). But the plaintiffs do not assert that theory of standing in this Court. In any event, the plaintiffs' complaint did not plausibly and clearly claim that the alleged mismanagement of the plan substantially increased the risk that the plan and the employer would fail and be unable to pay the plaintiffs' future pension benefits. It is true that the plaintiffs' complaint alleged that the plan was underfunded for a

period of time. But a bare allegation of plan underfunding does not itself demonstrate a substantially increased risk that the plan and the employer would both fail. Cf. *LaRue*, 552 U. S., at 255 ("Misconduct by the administrators of a defined benefit plan will not affect an individual's entitlement to a defined benefit unless it creates or enhances the risk of default by the entire plan").[2]

\*     \*     \*

Courts sometimes make standing law more complicated than it needs to be. There is no ERISA exception to Article III. And under ordinary Article III standing analysis, the plaintiffs lack Article III standing for a simple, commonsense reason: They have received all of their vested pension benefits so far, and they are legally entitled to receive the same monthly payments for the rest of their lives. Winning or losing this suit would not change the plaintiffs' monthly pension benefits. The plaintiffs have no concrete stake in this dispute and therefore lack Article III standing. We affirm the judgment of the U. S. Court of Appeals for the Eighth Circuit.

*It is so ordered.*

---

[2] Even if a defined-benefit plan is mismanaged into plan termination, the federal PBGC by law acts as a backstop and covers the vested pension benefits up to a certain amount and often in full. For example, if the plan and the employer in this case were to fail, the PBGC would be required to pay these two plaintiffs all of their vested pension benefits in full. See ERISA §§4022(a), (b), 29 U. S. C. §§1322(a), (b); Tr. of Oral Arg. 18–19; see also Congressional Research Service, Pension Benefit Guaranty Corporation (PBGC): A Primer 1 (2019); PBGC, General FAQs About PBGC, https://www.pbgc.gov/about/faq/general-faqs-about-pbgc. Any increased-risk-of-harm theory of standing therefore might not be available for plan participants whose benefits are guaranteed in full by the PBGC. But we need not decide that question in this case.

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–1712

_____

## JAMES J. THOLE, ET AL., PETITIONERS *v.* U. S. BANK N. A., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE EIGHTH CIRCUIT

[June 1, 2020]

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins, concurring.

I agree with the Court's opinion, which correctly applies our precedents and concludes that petitioners lack standing. I also agree that "[c]ourts sometimes make standing law more complicated than it needs to be." *Ante*, at 8. I write separately to observe that by requiring us to engage with petitioners' analogies to trust law, our precedents unnecessarily complicate this case.

The historical restrictions on standing provide a simpler framework. Article III vests "[t]he judicial Power of the United States" in the federal courts and specifies that it shall extend to enumerated categories of "Cases" and "Controversies." §§1, 2. "To understand the limits that standing imposes on 'the judicial Power,' . . . we must 'refer directly to the traditional, fundamental limitations upon the powers of common-law courts.'" *Spokeo*, *Inc.* v. *Robins*, 578 U. S. \_\_\_, \_\_\_ (2016) (THOMAS, J., concurring) (slip op., at 2) (quoting *Honig* v. *Doe*, 484 U. S. 305, 340 (1988) (Scalia, J., dissenting)); see also *Muskrat* v. *United States*, 219 U. S. 346, 356–357 (1911) (observing that the "judicial power with the right to determine 'cases' and 'controversies'" has long referred to "suit[s] instituted according to the regular course of judicial procedure").

"Common-law courts imposed different limitations on a

plaintiff's right to bring suit depending on the type of right the plaintiff sought to vindicate." *Spokeo*, 578 U. S., at ___ (THOMAS, J., concurring) (slip op., at 2). Rights were typically divided into private rights and public rights. Private rights are those "'belonging to individuals, considered as individuals.'" *Ibid.* (quoting 3 W. Blackstone, Commentaries *2); see also Woolhandler & Nelson, Does History Defeat Standing Doctrine? 102 Mich. L. Rev. 689, 693 (2004). Public rights are "owed 'to the whole community, considered as a community, in its social aggregate capacity.'" *Spokeo*, *supra*, at ___ (THOMAS, J., concurring) (slip op., at 3) (quoting 4 Blackstone, *supra*, at *5); see also Woolhandler & Nelson, *supra*, at 693.

Petitioners claim violations of private rights under the Employee Retirement Income Security Act of 1974 (ERISA). "In a suit for the violation of a private right, courts historically presumed that the plaintiff suffered a *de facto* injury [if] his personal, legal rights [were] invaded." *Spokeo*, *supra*, at ___ (THOMAS, J., concurring) (slip op., at 2). In this case, however, none of the rights identified by petitioners belong to them. The fiduciary duties created by ERISA are owed to the plan, not petitioners. See 29 U. S. C. §§1104(a)(1), 1105(a), 1106(a)(1), 1106(b), 1109(a). As participants in a defined benefit plan, petitioners have no legal or equitable ownership interest in the plan assets. See *ante*, at 4. There has been no assignment of the plan's rights by ERISA or any contract. See *ante*, at 5. And petitioners cannot rely on ERISA §502(a). Although it establishes certain causes of action, it creates no private right. See §1132(a).

There is thus no need to analogize petitioners' complaint to trust law actions, derivative actions, *qui tam* actions, or anything else. We need only recognize that the private rights that were allegedly violated do not belong to petitioners under ERISA or any contract.

Our ERISA precedents have especially complicated the

question of standing in this case due to their misinterpretations of the statute. I continue to object to this Court's practice of using the common law of trusts as the "starting point" for interpreting ERISA. *Varity Corp.* v. *Howe*, 516 U. S. 489, 497 (1996). "[I]n 'every case involving construction of a statute,' the 'starting point . . . is the language itself.'" *Id.*, at 528 (THOMAS, J., dissenting) (quoting *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 197 (1976); ellipsis in original). This is especially true for ERISA because its "statutory definition of a fiduciary departs from the common law." *Varity*, *supra,* at 528. The Court correctly applies *Varity* here, but in an appropriate case, we should reconsider our reliance on loose analogies in both our standing and ERISA jurisprudence.

# SUPREME COURT OF THE UNITED STATES

---

No. 17–1712

---

## JAMES J. THOLE, ET AL., PETITIONERS *v.* U. S. BANK N. A., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE EIGHTH CIRCUIT

[June 1, 2020]

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG, JUSTICE BREYER, and JUSTICE KAGAN join, dissenting.

The Court holds that the Constitution prevents millions of pensioners from enforcing their rights to prudent and loyal management of their retirement trusts. Indeed, the Court determines that pensioners may not bring a federal lawsuit to stop or cure retirement-plan mismanagement until their pensions are on the verge of default. This conclusion conflicts with common sense and longstanding precedent.

### I

### A

ERISA[1] protects "the interests of participants in employee benefit plans and their beneficiaries." 29 U. S. C. §1001(b). Chief among these safeguards is that "all assets of an employee benefit plan" must "be held in trust by one or more trustees" for "the exclusive purposes of providing benefits to participants in the plan and their beneficiaries." §§1103(a), (c)(1). A retirement plan's assets "shall never inure to the benefit of any employer." §1103(c)(1).

Because ERISA requires that retirement-plan assets be

---

[1] Employee Retirement Income Security Act of 1974, 88 Stat. 829, as amended, 29 U. S. C. §1001 *et seq.*

held in trust, it imposes on the trustees and other plan managers "'strict standards'" of conduct "'derived from the common law of trusts.'" *Fifth Third Bancorp* v. *Dudenhoeffer*, 573 U. S. 409, 416 (2014) (quoting *Central States, Southeast & Southwest Areas Pension Fund* v. *Central Transport, Inc.*, 472 U. S. 559, 570 (1985)). These "fiduciary duties" obligate the trustees and managers to act prudently and loyally, looking out solely for the best interest of the plan's participants and beneficiaries—typically, the employees who sacrifice wages today to secure their retirements tomorrow. §§1104, 1106. Not surprisingly, ERISA fiduciaries owe duties not only to the plan they manage, but also "to the beneficiaries" and participants for whom they manage it. *Harris Trust and Sav. Bank* v. *Salomon Smith Barney Inc.*, 530 U. S. 238, 241–242, 250 (2000).

If a fiduciary flouts these stringent standards, ERISA provides a cause of action and makes the fiduciary personally liable. §§1109, 1132. The United States Secretary of Labor, a plan participant or beneficiary, or another fiduciary may sue for "appropriate relief under section 1109." §1132(a)(2); see also §1132(a)(3) (permitting participants, beneficiaries, or fiduciaries to bring suit "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan"). Section 1109's remedies include restoration of lost assets, disgorgement of ill-gained profits, and removal of the offending fiduciaries. §1109(a).

B

Petitioners allege that, as of 2007, respondents breached their fiduciary duty of loyalty by investing pension-plan assets in respondents' own mutual funds and by paying themselves excessive management fees. (Petitioners further contend that this self-dealing persists today.) According to the complaint, the fiduciaries also made imprudent investments that allowed them to manipulate accounting rules, boost their reported incomes, inflate their stock prices, and

exercise lucrative stock options to their own (and their shareholders') benefit.

Then came the Great Recession. In 2008, the retirement plan lost $1.1 billion, allegedly $748 million more than a properly managed plan would have lost. So some of the plan's participants sued under 29 U. S. C. §1132(a) for the relief Congress contemplated: restoration of losses, disgorgement of respondents' ill-gotten profits and fees, removal of the disloyal fiduciaries, and an injunction to stop the ongoing breaches. Faced with this lawsuit, respondents returned to the plan about $311 million (less than half of what the plan had lost) and none of the profits respondents had unlawfully gained. See 873 F. 3d 617, 630–631 (CA8 2018).

## II

In the Court's words, the question here is whether petitioners have alleged a "concrete" injury to support their constitutional standing to sue. *Ante*, at 3. They have for at least three independent reasons.

## A

First, petitioners have an interest in their retirement plan's financial integrity, exactly like private trust beneficiaries have in protecting their trust. By alleging a $750 million injury to that interest, petitioners have established their standing.

### 1

This Court typically recognizes an "injury in fact" where the alleged harm "has a close relationship to" one "that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo, Inc.* v. *Robins*, 578 U. S. ___, ___ (2016) (slip op., at 9). Thus, the Court acknowledges that "private trust" beneficiaries have standing to protect the assets in which they have an "equitable" interest. *Ante*, at 3–4. The critical question, then, is

whether petitioners have an equitable interest in their re-
tirement plan's assets even though their pension payments
are fixed.

They do. ERISA expressly required the creation of a trust
in which petitioners are the beneficiaries: "[A]ll assets" of
the plan "shall be held in trust" for petitioners' "exclusive"
benefit. 29 U. S. C. §§1103(a), (c)(1); see also §1104(a)(1).[2]
These requirements exist regardless whether the employer
establishes a defined-benefit or defined-contribution plan.
§1101(a). Similarly, the Plan Document governing petition-
ers' defined-benefit plan states that, at "'all times,'" all plan
assets "'shall'" be in a "'trust fund'" managed for the par-
ticipants' and beneficiaries' "'exclusive benefit.'" App. 60–
61. The Plan Document also gives petitioners a residual
interest in the trust fund's assets: It instructs that, "[u]pon
termination of the Plan, each Participant [and] Beneficiary"
shall look to "the assets of the [trust f]und" to "provide the
benefits otherwise apparently promised in this Plan." Rec-
ord in No. 13–cv–2687 (D Minn.), Doc. 107–1, p. 75. This
arrangement confers on the "participants [and] beneficiar-
ies" of a defined-benefit plan an equitable stake, or a "com-
mon interest," in "the financial integrity of the plan." *Mas-
sachusetts Mut. Life Ins. Co.* v. *Russell*, 473 U. S. 134, 142,
n. 9 (1985).

Petitioners' equitable interest finds ample support in tra-
ditional trust law. "The creation of a trust," like the one
here, provides beneficiaries "an equitable interest in the
subject matter of the trust." Restatement (Second) of

———————
[2] Generally, "a trust is created when one person (a 'settlor' or 'grantor')
transfers property to a third party (a 'trustee') to administer for the ben-
efit of another (a 'beneficiary')." *North Carolina Dept. of Revenue* v. *Kim-
berley Rice Kaestner 1992 Family Trust*, 588 U. S. ___, ___ (2019) (slip
op., at 2); see also Restatement (Second) of Trusts §2 (1957). Neither the
Court nor respondents dispute that petitioners' pension fund meets these
elements.

Trusts §74, Comment *a*, p. 192 (1957); see *Blair* v. *Commissioner*, 300 U. S. 5, 13 (1937). Courts have long recognized that this equitable interest gives beneficiaries a basis to "have a breach of trust enjoined and . . . redress[ed]." *Ibid.*; see also *Spokeo*, 578 U. S., at \_\_\_ (slip op., at 9). That is, a beneficiary's equitable interest allows her to "maintain a suit" to "compel the trustee to perform his duties," to "enjoin the trustee from committing a breach of trust," to "compel the trustee to redress a breach of trust," and to "remove the trustee." Restatement (Second) of Trusts §199; see also *id.*, §205 (beneficiary may require a trustee to restore "any loss or depreciation in value of the trust estate" and "any profit made by [the trustee] through the breach of trust").[3]

So too here. Because respondents' alleged mismanagement lost the pension fund hundreds of millions of dollars, petitioners have stated an injury to their equitable property interest in that trust.

2

The Court, by contrast, holds that participants and beneficiaries in a defined-benefit plan have no stake in their plan's assets. *Ante*, at 4. In other words, the Court treats beneficiaries as mere bystanders to their own pensions.

That is wrong on several scores. For starters, it creates a paradox: In one breath, the Court determines that petitioners have "no equitable or property interest" in their plan's assets, *ante*, at 4; in another, the Court concedes that petitioners have an enforceable interest in receiving their "monthly pension benefits," *ante*, at 2. Benefits paid from where? The plan's assets, obviously. Precisely because petitioners have an interest in payments from their trust

—————

[3] Even contingent and discretionary beneficiaries (those who might not ever receive any assets from the trust) can sue to protect the trust absent a personal financial loss (or an imminent risk of loss). See A. Hess, G. Bogert, & G. Bogert, Law of Trusts and Trustees §871 (June 2019 update) (Bogert & Bogert) (listing cases).

fund, they have an interest in the integrity of the assets from which those payments come. See *Russell*, 473 U. S., at 142, n. 9.

The Court's contrary conclusion is unrecognizable in the fundamental trust law that both ERISA and the Plan Document expressly incorporated. If the participants and beneficiaries in a defined-benefit plan did not have equitable title to the plan's assets, then no one would. Yet that would mean that no "trust" exists, contrary to the plain terms of both ERISA and the Plan Document. See 29 U. S. C. §1103(a); App. 60; see also n. 2, *supra*; *Blair*, 300 U. S., at 13; Bogert & Bogert §1; Restatement (Second) of Trusts §74, Comment *a*, at 192.

Recognizing this problem, the Court asserts that, despite our case law, ERISA's text, and petitioners' Plan Document, trust law is not relevant at all. The Court announces that all "plaintiffs who allege mismanagement of a defined-benefit plan," regardless of their plan terms, cannot invoke a "trust-law analogy" to "support Article III standing." *Ante*, at 4.

That categorical conclusion has no basis in logic or law. Logically, the Court's reasoning relies on tautology. To distinguish an ERISA trust fund from a private trust fund, the Court observes that petitioners' payments have not "fluctuate[d] with the value of the plan or because of the plan fiduciaries' good or bad investment decisions" in the past, *ante,* at 1, so petitioners will necessarily continue to receive full payments "for the rest of their lives," no matter the outcome of this suit, *ante*, at 3. But that is circular: Petitioners will receive benefits indefinitely because they receive benefits now? The Court does not explain how the pension could satisfy its monthly obligation if, as petitioners allege, the plan fiduciaries drain the pool from which petitioners' fixed income streams flow.

Legally, the Court's analysis lists distinctions without a difference. First, the Court writes that a trust promising

fixed payments is not a trust because the promise "will not change, regardless of how well or poorly the [trust] is managed." *Ante,* at 4. That does not follow (a promise of payment differs from an actual payment) and it does not disprove a trust. Trusts vary in their terms, to be sure. See Bogert & Bogert §181 ("The settlor has great freedom in the selection of the beneficiaries and their interests"). But regardless whether a trust creates a "present interest" in "immediate enjoyment" of the trust property or "a future interest" in "receiv[ing] trust assets or benefits at a later time," the beneficiary "always" has an "equitable" stake. *Ibid.*

Second, the Court states that "the employer, not plan participants, receives any surplus left over after all of the benefits are paid" and "the employer, not plan participants, is on the hook for plan shortfalls." *Ante,* at 4; see also *ante,* at 7 (noting that "the federal Pension Benefit Guaranty Corporation is required by law to pay" some benefits if a plan fails). But that does not distinguish ERISA from standard trust law, either. It does not matter that other parties besides beneficiaries may have a residual stake in trust assets; a beneficiary with a life-estate interest in payments from a trust still has an equitable interest. See Bogert & Bogert §706. Even life-beneficiaries may "requir[e]" the trustee "to pay the trust the amount necessary to place the trust account in the position in which it would have been, had the [trustee's fiduciary] duty been performed." *Ibid.* If anything, petitioners' equitable interests are stronger than those of their common-law counterparts; the Plan Document provides petitioners a residual interest in the pension fund's assets even after the trust terminates. See Record in No. 13–cv–2687, Doc. 107–1, at 75.

Nor is it relevant whether additional parties (including an insurance carrier) are "on the hook" for plan shortfalls after a loss occurs. Cf. *ante,* at 4, 6, 7, 8, n. 2. The Court appears to conclude that insurance (or other protections to

remedy trust losses) would deprive beneficiaries of their equitable interests in their trusts. See *ibid.* But the Court cites nothing supporting that proposition. To the contrary, it is well settled that beneficiaries retain equitable interests in trust assets even when those assets are insured or replenished. See Bogert & Bogert §599. Some States and trusts require that the "property of a trust . . . be insured" or similarly protected; indeed, some jurisdictions impose on trustees a fiduciary "duty to insure." *Ibid.* (collecting authorities). None of those authorities suggests that beneficiaries lose their equitable interests as a result, and none suggests that the law excuses a fiduciary's malfeasance simply because other sources may help provide relief. The Court's opposing view—that employer liability and insurance pardon a trustee's wrongdoing from a beneficiary's suit—has no support in law.

Third, the Court draws a line between a trust and a contract, *ante,* at 4, but this too is insignificant here. The Court declares that petitioners' pension plan "is more in the nature of a contract," *ibid.,* but then overlooks that the so-called contract creates a trust. The Plan Document expressly requires that petitioners' pension funds be held in a "trust" exclusively for petitioners' benefit. App. 60–61. The Court's statement that "the employer, not plan participants, receives any surplus left over after all of the benefits are paid," cf. *ante,* at 4, actually proves that a trust exists. The reason the employer does not receive any residual until "after all of the benefits are paid," *ibid.,* is because the Plan Document provides petitioners an enforceable residual interest, Record in No. 13–cv–2687, Doc. 107–1, at 75. It is telling that the Court does not cite, let alone analyze, the "contract" governing petitioners' trust fund.

Last, the Court cites inapposite case law. It asserts that "this Court has stated" that "plan participants possess no equitable or property interest in the plan." *Ante*, at 4 (citing *Hughes Aircraft Co.* v. *Jacobson*, 525 U. S. 432 (1999), and

*LaRue* v. *DeWolff, Boberg & Associates, Inc.*, 552 U. S. 248 (2008)). But precedent has said no such thing. Quite the opposite: *Russell* explained that defined-benefit-plan beneficiaries have a "common interest" in the "financial integrity" of their defined-benefit plan. 473 U. S., at 142, n. 9.

Neither *Hughes* nor *LaRue* suggests otherwise. *Hughes* explained that a defined-benefit-plan beneficiary does not have "a claim to any particular asset that composes a part of the plan's general asset pool." 525 U. S., at 440. But that statement concerned whether the beneficiaries had a legal right to extra payments after the plan's assets grew. *Id.*, at 436–437. Whether a beneficiary has a legal claim to payment when a plan gains money says nothing about whether a beneficiary has an equitable interest to restore assets when a plan loses money. *Hughes*, in fact, invited a suit like petitioners': The Court suggested that the plaintiffs could have prevailed had they "allege[d] that [the employer] used any of the assets for a purpose other than to pay its obligations to the Plan's beneficiaries." *Id.*, at 442–443. Equally telling is that *Hughes* resolved the beneficiaries' breach-of-fiduciary claims on the merits without doubting whether the plaintiffs had standing to assert them. See *id.*, at 443–446; *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 94–95 (1998) (explaining this Court's independent duty to assure itself of Article III standing).

*LaRue* is even less helpful to today's Court. That case involved a defined-contribution plan, not a defined-benefit plan. 552 U. S., at 250. It was about remedies, not rights. See *id.,* at 256. And it stated that although "individual injuries" may occur from ERISA plan mismanagement, the statutory provision at issue required that the remedy go to the plan. *Ibid.* (discussing 29 U. S. C. §1132(a)(2)). *LaRue* said nothing about standing and nothing about ERISA's

other statutory remedies.[4]  In fact, *LaRue* confirmed that
ERISA beneficiaries like petitioners may sue fiduciaries for
"'any profit which would have accrued to the [plan] if there
had been no breach of trust,'" 552 U. S., at 254, n. 4, or
where "fiduciary breaches . . . impair the value of plan as-
sets," *id.*, at 256.  Because petitioners bring those kinds of
claims, *LaRue* supports their standing.

## B

Second, petitioners have standing because a breach of
fiduciary duty is a cognizable injury, regardless whether
that breach caused financial harm or increased a risk of
nonpayment.

## 1

A beneficiary has a concrete interest in a fiduciary's loy-
alty and prudence.  For over a century, trust law has pro-
vided that breach of "a fiduciary or trust relation" makes
the trustee "suable in equity."  *Clews* v. *Jamieson*, 182 U. S.
461, 480–481 (1901).  That is because beneficiaries have an
enforceable "right that the trustee shall perform the trust
in accordance with the directions of the trust instrument
and the rules of equity."  Bogert & Bogert §861; see also
Restatement (Second) of Trusts §199 (trust beneficiary may
"maintain a suit" for breach of fiduciary duty).

That interest is concrete regardless whether the benefi-
ciary suffers personal financial loss.  A beneficiary may sue
a trustee for restitution or disgorgement, remedies that rec-
ognize the relevant harm as the trustee's wrongful gain.
Through restitution law, trustees are "subject to liability" if
they are unjustly enriched by a "'violation of [a benefi-
ciary]'s legally protected rights,'" like a breach of fiduciary

———————

[4] The Court expressly declined to address other relief like that provided
under §1132(a)(3), see *LaRue*, 552 U. S., at 252, a provision that petition-
ers invoke here.

duty. Restatement (Third) of Restitution and Unjust En-richment §1, and Comment *a*, p. 3 (2010). Similarly, dis-gorgement allows a beneficiary to "stri[p]" the trustee of "a wrongful gain." *Id.*, §3, Comment *a*, at 22. Our Court drew on these principles almost 200 years ago when it stated that a trustee's breach of loyalty supports a cause of action "without any further inquiry" into gain or loss to a trust or its beneficiaries. *Michoud* v. *Girod*, 4 How. 503, 553 (1846); see also, *e.g.*, *id.*, at 556–557 (noting this rule's roots in "English courts of chancery from an early day"); see also *Magruder* v. *Drury*, 235 U. S. 106, 120 (1914) (under "the principles governing the duty of a trustee," it "makes no dif-ference that the [trust] estate was not a loser in the trans-action"); Bogert & Bogert §543 (similar). Put another way, "traditional remedies" like "unjust enrichment . . . are not contingent on a plaintiff's allegation of damages beyond the violation of his private legal right." *Spokeo*, 578 U. S., at \_\_\_–\_\_\_ (THOMAS, J., concurring) (slip op., at 2–3).

Nor does it matter whether the beneficiaries receive the remedy themselves. A beneficiary may require a trustee to "restore" assets directly "to the trust fund." Bogert & Bogert §861; see also Restatement (Second) of Trusts §205. In fact, because fiduciary duties are so paramount, the rem-edy need not involve money at all. A beneficiary may sue to "enjoin the trustee from committing a breach of trust" and to "remove the trustee." *Id.*, §199.

Congress built on this tradition by making plan fiduciar-ies expressly liable to restore to the plan wrongful profits and any losses their breach caused, and by providing for in-junctive relief to stop the misconduct and remove the wrongdoers. See 29 U. S. C. §§1109, 1132(a)(2), (3). In do-ing so, Congress rejected the Court's statement that a "trust-law analogy . . . does not" apply to "plaintiffs who al-lege mismanagement of a defined-benefit plan." Cf. *ante,* at 4. To the contrary, ERISA imposes "trust-like fiduciary standards," *Varity Corp.* v. *Howe*, 516 U. S. 489, 497 (1996),

to "[r]espon[d] to deficiencies in prior law regulating [retirement] plan fiduciaries" and to provide even greater protections for defined-benefit-plan beneficiaries, *Harris Trust*, 530 U. S., at 241–242; see also *Spokeo*, 578 U. S., at ___ (slip op., at 9) (historical and congressionally recognized injuries often support standing).

Given all that history and ERISA's text, this Court itself has noted, in the defined-benefit-plan context, "that when a trustee" breaches "his fiduciary duty to the beneficiaries," the "beneficiaries may then maintain an action for restitution . . . or disgorgement." *Harris Trust*, 530 U. S., at 250. *Harris Trust* confirms that ERISA incorporated "[t]he common law of trusts" to allow defined-benefit-plan beneficiaries to seek relief from fiduciary breaches. *Ibid.*; see also *id.*, at 241–242 (noting that certain ERISA provisions "supplemen[t] the fiduciary's general duty of loyalty to the plan's beneficiaries").[5]

2

The Court offers no reply to all the historical and statutory evidence showing petitioners' concrete interest in prudent and loyal fiduciaries.

Instead, the Court insists again that "participants in a defined-benefit plan are not similarly situated to the beneficiaries of a private trust," *ante,* at 4, and that the "complaint did not plausibly and clearly claim that the alleged mismanagement of the plan substantially increased the

———————

[5] Curiously, today's Court suggests that ERISA's efforts to bolster trust-law fiduciary duties actually degraded them instead. See *ante*, at 4 (justifying a narrow construction of ERISA protections because "trust law informs but does not control interpretation of ERISA"). Yet the case the Court cites, *Varity Corp.* v. *Howe*, 516 U. S. 489 (1996), relied on trust law to establish the minimum obligations ERISA imposes on plan fiduciaries. See *id.*, at 506 (confirming that the "ERISA fiduciary duty includes [the] common law duty of loyalty"). Today's Court mistakes the floor for the ceiling. See *ibid.*; see also *Harris Trust*, 530 U. S., at 241–242.

risk that the plan and the employer would fail and be unable to pay the plaintiffs' future pension benefits," *ante*, at 7.

The first observation is incorrect for the reasons stated above. But even were the Court correct that petitioners' rights do not sound in trust law, petitioners would still have standing. The Court reasons that petitioners have an enforceable right to "monthly payments for the rest of their lives" because their plan confers a "contractua[l] entitle[ment]." *Ante*, at 2. Under that view, the plan also confers contractual rights to loyal and prudent plan management. See App. 60–61; 29 U. S. C. §§1104, 1109.

Thus, for the same reason petitioners could bring suit if they did not receive payments from their plan, they could bring suit if they did not receive loyalty and prudence from their fiduciaries. After all, it is well settled that breach of "a contract to act diligently and skil[l]fully" provides a "groun[d] of action" in federal court. *Wilcox* v. *Executors of Plummer*, 4 Pet. 172, 181–182 (1830). It is also undisputed that "[a] breach of contract always creates a right of action," even when no financial "harm was caused." Restatement (First) of Contracts §328, and Comment *a*, pp. 502–503 (1932); see also *Spokeo*, 578 U. S., at \_\_\_–\_\_\_ (THOMAS, J., concurring) (slip op., at 2–3) ("[C]ourts historically presumed that the plaintiff suffered a *de facto* injury merely from having his personal, legal rights invaded" even without any "allegation of damages"). Petitioners would thus have standing even were they to accept the Court's flawed premise.

The Court's second statement, that petitioners have not alleged a substantial risk of missed payments, *ante,* at 7, is orthogonal to the issues at hand. A breach-of-fiduciary-duty claim exists regardless of the beneficiary's personal gain, loss, or recovery. In rejecting petitioners' standing and maintaining that "this suit would not change [petitioners'] monthly pension benefits," *ante*, at 8, the Court fails to

distinguish the different rights on which pension-plan ben-
eficiaries may sue. They have a right not just to their pen-
sion benefits, but also to loyal and prudent fiduciaries. See
*Warth* v. *Seldin*, 422 U. S. 490, 500 (1975) (the standing in-
quiry "turns on the nature and source of the claim as-
serted"). Petitioners seek relief tailored to the second cate-
gory, including restitution, disgorgement, and injunctive
remedies. Cf. *Great-West Life & Annuity Ins. Co.* v. *Knud-
son*, 534 U. S. 204, 215–216 (2002) (explaining the various
historical bases for ERISA's remedies). The Court does not
even try to explain ERISA's (or the Plan Document's) text
imposing fiduciary duties, let alone this Court's decision in
*Harris Trust* supporting petitioners' standing. And even
though the Court briefly mentions that petitioners seek "in-
junctive relief, including replacement of the plan's fiduciar-
ies," *ante,* at 2, it offers no analysis on that issue. Put dif-
ferently, the Court denies petitioners standing to sue
without analyzing all their claims to relief.

    With its focus on fiscal harm, the Court seems to suggest
that pecuniary injury is the *sine qua non* of standing. The
Court emphasizes that petitioners themselves have not
"sustained any monetary injury" apart from their trust
fund's losses. *Ante,* at 2; see also *ante*, at 4.

    But injury to a plaintiff's wallet is not, and has never
been, a prerequisite for standing. The Constitution permits
federal courts to hear disputes over nonfinancial injuries
like the harms alleged here. *Spokeo*, 578 U. S., at ___ (slip
op., at 9); see also, *e.g.*, *id.*, at ___–___ (THOMAS, J., concur-
ring) (slip op., at 2–3); *Tennessee Elec. Power Co.* v. *TVA*,
306 U. S. 118, 137–138 (1939).[6] In *Heckler* v. *Mathews*, 465

_____

    [6] This Court has found standing in myriad cases involving noneco-
nomic injuries. Examples include the denial or threatened impairment
of: equal treatment, *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200,
211 (1995); *Northeastern Fla. Chapter, Associated Gen. Contractors of
America* v. *Jacksonville*, 508 U. S. 656, 666 (1993); "truthful information

U. S. 728 (1984), for instance, this Court recognized a plaintiff's standing to assert a "noneconomic" injury for discriminatory distribution of his Social Security benefits, even though he did not have "a substantive right to any particular amount of benefits." *Id.*, at 737, 739. Petitioners' standing here is even sturdier: They assert a noneconomic injury for unlawful management of their retirement plan and, unlike the plaintiff in *Heckler*, petitioners do have a substantive right to a particular amount of benefits. Cf. *ante*, at 2 (acknowledging that petitioners' benefits are "vested" and that payments are "legally and contractually" required).

None of this is disputed. In fact, the Court seems to concede all this reasoning in a footnote. See *ante,* at 6, n. 1. The Court appears to acknowledge that an ERISA beneficiary's noneconomic right to information from the fiduciaries would support standing. See *ibid.* (citing 29 U. S. C. §1132(a)(1)(A)). Yet the Court offers no reason to think that a beneficiary's noneconomic right to loyalty and prudence from the fiduciaries is meaningfully different.

For its part, the concurrence attempts to fill the Court's gaps by adding that "[t]he fiduciary duties created by ERISA are owed to the plan, not petitioners." *Ante*, at 2 (opinion of THOMAS, J.). But this Court has already rejected

---

concerning the availability of housing," *Havens Realty Corp.* v. *Coleman*, 455 U. S. 363, 373 (1982); esthetic and recreational interests, *Friends of the Earth*, *Inc.* v. *Laidlaw Environmental Services (TOC)*, *Inc.*, 528 U. S. 167, 181–182 (2000); "information which must be publicly disclosed pursuant to a statute," *Federal Election Comm'n* v. *Akins*, 524 U. S. 11, 21 (1998); one's "personal, political, and professional reputation," *Meese* v. *Keene*, 481 U. S. 465, 473 (1987); and the right to speak, *Spokeo*, 578 U. S., at \_\_\_ (slip op., at 9) (citing *Pleasant Grove City* v. *Summum*, 555 U. S. 460 (2009)). This Court has even said that a for-profit business has standing to assert religious injuries. See *Burwell* v. *Hobby Lobby Stores*, *Inc.*, 573 U. S. 682, 715, and n. 26 (2014). Today's Court does not reconcile these cases with its novel financial-harm requirement; nor does the Court explain why a breach of fiduciary duty is less concrete than the injuries listed above.

that view.  Compare *Varity Corp.*, 516 U. S., at 507 ("This argument fails"), with *id.*, at 516 (THOMAS, J., dissenting).

Nor is that argument persuasive on its own terms.  The concurrence relies on a compound prepositional phrase taken out of context, collecting ERISA provisions saying that a fiduciary acts "with respect to" a plan.  See *ante*, at 2 (opinion of THOMAS, J.).  Of course a plan fiduciary performs her duties "with respect to a plan."  29 U. S. C. §1104(a)(1).  After all, she manages the plan.  §1102(a).  But she does so "solely in the interest" and "for the exclusive purposes" of the plan's "participants and beneficiaries." §§1103(a), (c)(1), 1104(a)(1).

In short, the concurrence gets it backwards.  Congress did not enact ERISA to protect plans as artificial entities.  It enacted ERISA (and required trusts in the first place) to protect the plan "participants" and "their beneficiaries." §1001(b).  Thus, ERISA fiduciary duties run where the statute says: to the participants and their beneficiaries.

C

Last, petitioners have standing to sue on their retirement plan's behalf.

1

Even if petitioners had no suable interest in their plan's financial integrity or its competent supervision, the plan itself would.  There is no disputing at this stage that respondents' "mismanagement" caused the plan "approximately $750 million in losses" still not fully reimbursed.  *Ante*, at 2 (majority opinion).  And even under the concurrence's view, respondents' fiduciary duties "are owed to the plan."  *Ante*, at 2 (opinion of THOMAS, J.).  The plan thus would have standing to sue under either theory discussed above.

The problem is that the plan is a legal fiction: Although ERISA provides that a retirement plan "may sue . . . as an entity," 29 U. S. C. §1132(d)(1), someone must still do so on

the plan's behalf. Typically that is the fiduciary's job. See §1102(a)(1) (fiduciaries have "authority to control and manage the operation and administration of the plan"). But imagine a case like this one, where the fiduciaries refuse to sue because they would be the defendants. Does the Constitution compel a pension plan to let a fox guard the henhouse?

Of course not. This Court's representational standing doctrine permits petitioners to sue on their plan's behalf. See *Food and Commercial Workers* v. *Brown Group, Inc.*, 517 U. S. 544, 557 (1996). This doctrine "rests on the premise that in certain circumstances, particular relationships (recognized either by common-law tradition or by statute) are sufficient to rebut the background presumption . . . that litigants may not assert the rights of absent third parties." *Ibid.* (footnotes omitted). This is especially so where, as here, there is "some sort of impediment" to the other party's "effective assertion of their own rights." R. Fallon, J. Manning, D. Meltzer, & D. Shapiro, Hart & Wechsler's The Federal Courts and the Federal System 158 (6th ed. 2009); see also *Powers* v. *Ohio*, 499 U. S. 400, 410–411 (1991).

The common law has long regarded a beneficiary's representational suit as a proper "basis for a lawsuit in English or American courts." *Spokeo*, 578 U. S., at \_\_\_ (slip op., at 9). When "the trustee cannot or will not" sue, a beneficiary may do so "as a temporary representative of the trust." Bogert & Bogert §869. The common law also allows "the terms of a trust" to "confer upon others the power to enforce the trust," giving that person "standing" to "bring suit against the trustee." Restatement (Third) of Trusts §94, Comment *d(1)*, at 7.

ERISA embraces this tradition. Sections 1132(a)(2) and (a)(3) authorize participants and beneficiaries to sue "in a representative capacity on behalf of the plan as a whole," *Russell*, 473 U. S., at 142, n. 9, so that any "recovery" arising from the action "inures to the benefit of the plan as a

whole," *id.*, at 140. Perhaps for this reason, and adding to the incongruity in today's outcome, some Members of this Court have insisted that lawsuits to enforce ERISA's fiduciary duties "must" be brought "in a representative capacity." *Varity Corp.*, 516 U. S., at 516 (THOMAS, J., dissenting) (internal quotation marks omitted).

Permitting beneficiaries to enforce their plan's rights finds plenty of support in our constitutional case law. Take associational standing: An association may file suit "to redress its members' injuries, even without a showing of injury to the association itself." *Food and Commercial Workers*, 517 U. S., at 552. All Article III requires is that a member "'would otherwise have standing to sue in their own right'" and that "'the interests [the association] seeks to protect are germane to the organization's purpose.'" *Id.*, at 553. Petitioners' suit here is the other side of the same coin: The plan would have standing to sue in its own right, and petitioners' interest is to disgorge wrongful profits and reimburse the trust for losses, thereby preserving trust assets held for their exclusive benefit.

Next-friend standing is another apt analog. Long "accepted [as a] basis for jurisdiction," this doctrine allows a party to "appear in [federal] court on behalf of detained prisoners who are unable . . . to seek relief themselves." *Whitmore* v. *Arkansas*, 495 U. S. 149, 162 (1990) (tracing the doctrine's roots to the 17th century). Here, of course, petitioners' plan cannot access the courts itself because the parties the Court thinks should file suit (the fiduciaries) are the defendants. Like a "next friend," moreover, petitioners are "dedicated to the best interests" of the party they seek to protect, *id.*, at 163, because the plan's interests are petitioners' interests.[7]

_____

[7] Other examples include guardians ad litem and, of course, trustees. *E.g.*, *Sprint Communications Co.* v. *APCC Services, Inc.*, 554 U. S. 269,

Congress was on well-established ground when it allowed pension participants and beneficiaries to sue on their retirement plan's behalf.

### 2

The Court's conflicting conclusion starts with inapposite cases. It invokes *Hollingsworth* v. *Perry*, 570 U. S. 693, 708 (2013), reasoning that "to claim 'the interests of others, the litigants themselves still must have suffered an injury in fact.'" *Ante*, at 4. *Perry*, a case about a California ballot initiative, is a far cry from this one. *Perry* found that "private parties" with no stake in the litigation "distinguishable from the general interest of every citizen" were not proper representatives of the State. 570 U. S., at 707, 710. If anything, *Perry* supports petitioners here: This Court found "readily distinguishable" other representational-standing cases by underscoring their sound traditions. *Id.*, at 711 (distinguishing assignee and next-friend standing).[8] A traditional beneficiary-versus-trustee claim like petitioners' is exactly such a suit.

Next, the Court maintains that petitioners "have not been legally or contractually assigned" or "appointed" to

---

287 (2008) (noting in the Article III standing context that "federal courts routinely entertain suits which will result in relief for parties that are not themselves directly bringing suit," such as when "[t]rustees bring suits to benefit their trusts"); see also *id.*, at 304–305, n. 2 (ROBERTS, C. J., dissenting) ("Trustees, guardians ad litem, executors, and the like make up a settled, continuous practice 'of the sort traditionally amenable to, and resolved by, the judicial process'").

[8] The Court cites two more cases: *Gollust* v. *Mendell*, 501 U. S. 115 (1991), and *Craig* v. *Boren*, 429 U. S. 190 (1976). But both endorsed expansive views of standing. See *Gollust*, 501 U. S., at 125–127 (allowing indirect owners of a corporation to sue under federal securities laws); *Craig*, 429 U. S., at 194–195 (holding that a plaintiff had representational standing to assert an equal protection claim on a business patron's behalf ). To the extent the Court suggests that a financial loss is necessary (or that a breach of fiduciary duty is insufficient) for standing, that is incorrect. See Part II–B, *supra*.

represent the plan. *Ante*, at 5. Although a formal assignment or appointment suffices for standing, it is not necessary. See, *e.g.*, *Food and Commercial Workers*, 517 U. S., at 552; *Whitmore*, 495 U. S., at 162. Regardless, Congress expressly and thereby legally assigned pension-plan participants and beneficiaries the right to represent their plan, including in lawsuits where the other would-be representative is the defendant. 29 U. S. C. §§1132(a)(2), (3); see also, *e.g.*, Restatement (Third) of Trusts §94, Comment *d(1)*, at 7 (trust terms may confer standing to sue the trustee). ERISA was "primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan." *Russell*, 473 U. S., at 142; see also *id.*, at 140–142, nn. 8–9.[9] Far from "'automatically'" conferring petitioners standing to sue or creating an injury from whole cloth, cf. *ante,* at 5, ERISA assigns the right to sue on the plan's unquestionably cognizable harm: here, fiduciary breaches causing wrongful gains and hundreds of millions of dollars in losses. So even under the Court's framing, it does not matter whether petitioners "sustained any monetary injury," *ante*, at 2, because their pension plan did.

To support standing, a statute may (but need not) legally designate a party to sue on another's behalf. Because ERISA does so here, petitioners should be permitted to sue for their pension plan's sake.

---

[9] Neither *Sprint*, 554 U. S. 269, nor *Vermont Agency of Natural Resources* v. *United States ex rel. Stevens*, 529 U. S. 765 (2000), is to the contrary. Cf. *ante*, at 5. Both decisions undermine today's result. See *Sprint*, 554 U. S., at 280, 287 (noting in the Article III context that "'naked legal title'" has long permitted suit and that "federal courts routinely entertain suits which will result in relief for parties that are not themselves directly bringing suit," such as when "[t]rustees bring suits to benefit their trusts"); *Vermont Agency*, 529 U. S., at 774 (showing that even a partial statutory assignment grants constitutional standing to sue on another's behalf ).

## III

The Court also notes that "[e]ven if a defined-benefit plan is mismanaged into plan termination, the federal [Pension Benefit Guaranty Corporation] by law acts as a backstop and covers the vested pension benefits up to a certain amount and often in full." *Ante,* at 8, n. 2. The Court then suggests that the only way beneficiaries of a mismanaged plan could sue is if their benefits were not "guaranteed in full by the PBGC." *Ibid.*

Those statements underscore the problem in today's decision. Whereas ERISA and petitioners' Plan Document explicitly mandate that all plan assets be handled prudently and loyally for petitioners' exclusive benefit, the Court suggests that beneficiaries should endure disloyalty, imprudence, and plan mismanagement so long as the Federal Government is there to pick up the bill when "the plan and the employer" "fail." *Ibid.*

But the purpose of ERISA and fiduciary duties is to prevent retirement-plan failure in the first place. 29 U. S. C. §1001. In barely more than a decade, the country (indeed the world) has experienced two unexpected financial crises that have rocked the existence and stability of many employers once thought incapable of failing. ERISA deliberately provides protection regardless whether an employer is on sound financial footing one day because it may not be so stable the next. See *ibid.*[10]

The Court's references to Government insurance also overlook sobering truths about the PBGC. The Government Accountability Office recently relisted the PBGC as one of the "High Risk" Government programs most likely to become insolvent. See GAO, Report to Congressional Committees, High-Risk Series: Substantial Efforts Needed To

———————

[10] This also explains why a material risk of loss is not a prerequisite for standing, least of all for retirees relying on their retirement plan for income. Cf. *ante,* at 7–8.

Achieve Greater Progress on High-Risk Areas (GAO–19–157SP, 2019) (GAO High-Risk Report).  Noting the insolvency of defined-benefit plans that the PBGC insures and the "significant financial risk and governance challenges that the PBGC faces," the GAO High-Risk Report warns that "the retirement benefits of millions of American workers and retirees could be at risk of dramatic reductions" within four years. *Id.*, at 56–57.  At last count, the PBGC's "net accumulated financial deficit" was "over $51 billion" and its "exposure to potential future losses for underfunded plans" was "nearly $185 billion." *Id.,* at 267.  Notably, the GAO had issued these warnings before the current financial crisis struck.  Exchanging ERISA's fiduciary duties for Government insurance would only add to the PBGC's plight and require taxpayers to bail out pension plans.

IV

It is hard to overstate the harmful consequences of the Court's conclusion.  With ERISA, "the crucible of congressional concern was misuse and mismanagement of plan assets by plan administrators." *Russell*, 473 U. S., at 141, n. 8.  In imposing fiduciary duties and providing a private right of action, Congress "designed" the statute "to prevent these abuses in the future." *Ibid.*  Yet today's outcome encourages the very mischief ERISA meant to end.

After today's decision, about 35 million people with defined-benefit plans[11] will be vulnerable to fiduciary misconduct.  The Court's reasoning allows fiduciaries to misuse pension funds so long as the employer has a strong enough balance sheet during (or, as alleged here, because of ) the misbehavior.  Indeed, the Court holds that the Constitution

---

[11] See Dept. of Labor, Private Pension Plan Bulletin Historical Tables and Graphs, 1975–2017 (Sept. 2019) (Table E4), https://www.dol.gov/sites/dolgov/files/EBSA/researchers/statistics/ retirement-bulletins/private-pension-plan-bulletin-historical-tables-and-graphs.pdf.

forbids retirees to remedy or prevent fiduciary breaches in federal court until their retirement plan or employer is on the brink of financial ruin. See *ante*, at 7–8. This is a remarkable result, and not only because this case is bookended by two financial crises. There is no denying that the Great Recession contributed to the plan's massive losses and statutory underfunding, or that the present pandemic punctuates the perils of imprudent and disloyal financial management.

Today's result also disrupts the purpose of ERISA and the trust funds it requires. Trusts have trustees and fiduciary duties to protect the assets and the beneficiaries from the vicissitudes of fortune. Fiduciary duties, especially loyalty, are potent prophylactic rules that restrain trustees "tempted to exploit [a] trust." Bogert & Bogert §543. Congress thus recognized that one of the best ways to protect retirement plans was to codify the same fiduciary duties and beneficiary-enforcement powers that have existed for centuries. *E.g.*, 29 U. S. C. §§1001(b), 1109, 1132. Along those lines, courts once held fiduciaries to a higher standard: "Not honesty alone, but the punctilio of an honor the most sensitive." *Meinhard* v. *Salmon*, 249 N. Y. 458, 464, 164 N. E. 545, 546 (1928) (Cardozo, C. J.). Not so today.

Nor can petitioners take comfort in the so-called "regulatory phalanx" guarding defined-benefit plans from mismanagement. *Ante*, at 7. Having divested ERISA of enforceable fiduciary duties and beneficiaries of their right to sue, the Court lists "employers and their shareholders," other fiduciaries, and the "Department of Labor" as parties on whom retirees should rely. *Ante*, at 6–7. But there are serious holes in the Court's proffered line of defense.

The Court's proposed solutions offer nothing in a case like this one. The employer, its shareholders, and the plan's co-fiduciaries here have no reason to bring suit because they either committed or profited from the misconduct. Recall

the allegations: Respondents misused a pension plan's assets to invest in their own mutual funds, pay themselves excessive fees, and swell the employer's income and stock prices. Nor is the Court's suggestion workable in the mine run of cases. The reason the Court gives for trusting employers and shareholders to look out for beneficiaries—"because the employers are entitled to the plan surplus and are often on the hook for plan shortfalls," *ante*, at 6—is what commentators call a conflict of interest.[12]

Neither is the Federal Government's enforcement power a palliative. "ERISA makes clear that Congress did not intend for Government enforcement powers to lessen the responsibilities of plan fiduciaries." *Central States*, 472 U. S., at 578. The Secretary of Labor, moreover, signed a brief (in support of petitioners) verifying that the Federal Government cannot "monitor every [ERISA] plan in the country." Brief for United States as *Amicus Curiae* 26. Even when the Government can sue (in a representational capacity, of course), it cannot seek all the relief that a participant or beneficiary could. Compare 29 U. S. C. §1132(a)(2) with §1132(a)(3). At bottom, the Court rejects ERISA's private-enforcement scheme and suggests a preference that taxpayers fund the monitoring (and perhaps the bailing out) of pension plans. See *ante*, at 6–8, and n. 2.

Finally, in justifying today's outcome, the Court discusses attorney's fees. Twice the Court underlines that attorneys have a "$31 million" "stake" in this case. *Ante*, at 2, 3. But no one in this litigation has suggested attorney's fees as a

---

[12] *E.g.*, Fischel & Langbein, ERISA's Fundamental Contradiction: The Exclusive Benefit Rule, 55 U. Chi. L. Rev. 1105, 1121 (1988). This conflict exists because, contrary to the Court's assertion, the employer and its shareholders are not "entitled to the plan surplus" until after the plan terminates and after all vested benefits have been paid from the trust fund's assets. Compare *ante*, at 6, with 29 U. S. C. §1103(c)(1) (ERISA plan assets "shall never inure to the benefit of any employer" while the trust exists); see also App. 61; Record in No. 13–cv–2687 (D Minn.), Doc. 107–1, p. 75.

basis for standing. As the Court appears to admit, its focus on fees is about optics, not law. See *ante*, at 3 (acknowledging that attorney's fees do not advance the standing inquiry).

The Court's aside about attorneys is not only misplaced, it is also mistaken. Missing from the Court's opinion is any recognition that Congress found private enforcement suits and fiduciary duties critical to policing retirement plans; that it was after this litigation was initiated that respondents restored $311 million to the plan in compliance with statutorily required funding levels; and that counsel justified their fee request as a below-market percentage of the $311 million employer infusion that this lawsuit allegedly precipitated.

\*     \*     \*

The Constitution, the common law, and the Court's cases confirm what common sense tells us: People may protect their pensions. "Courts," the majority surmises, "sometimes make standing law more complicated than it needs to be." *Ante*, at 8. Indeed. Only by overruling, ignoring, or misstating centuries of law could the Court hold that the Constitution requires beneficiaries to watch idly as their supposed fiduciaries misappropriate their pension funds. I respectfully dissent.