*Duke v. Luxottica U.S. Holdings Corp.*

# United States Court of Appeals
# For the Second Circuit

August Term 2025
Argued: January 13, 2026
Decided: February 5, 2026

No. 24-3207

JANET DUKE, on behalf of herself and all others similarly situated,

*Plaintiff-Appellee,*

*v.*

LUXOTTICA U.S. HOLDINGS CORP., OAKLEY INC., LUXOTTICA GROUP
ERISA PLANS COMPLIANCE AND INVESTMENT COMMITTEE, LUXOTTICA
GROUP PENSION PLAN,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Eastern District of New York
No. 21-cv-6072, Choudhury, *Judge.*

Before: ROBINSON, NATHAN, and KAHN, *Circuit Judge*s.

––––––––

Plaintiff seeks to represent a class of participants in a defined benefit retirement plan under the Employee Retirement Income Security Act (ERISA), alleging that the plan systematically violates ERISA by using outdated actuarial assumptions in calculating benefits. The plaintiff invokes two of ERISA's remedial provisions: relief on behalf of the plan (in the form of plan reformation and monetary repayment to the plan) through a Section 502(a)(2) representative action and relief for herself and other participants under Section 502(a)(3). Pursuant to an agreement between the plaintiff and her former employer, the district court compelled individual arbitration of the Section 502(a)(3) claim. We hold that the plaintiff has standing to seek, on behalf of the plan under Section 502(a)(2), plan reformation but not monetary payments to the plan; that the effective vindication doctrine precludes mandatory arbitration of that claim; and that the district court did not err in denying a motion for a mandatory stay of litigation. Given the posture of this appeal, we do not consider whether the plan reformation the plaintiff seeks is, in fact, available as a remedy under Section 502(a)(2). **AFFIRMED** in part and **REVERSED** in part.

RACHANA PATHAK, Stris & Maher LLP, Cerritos, CA, (Peter K. Stris, Jeff Hahn, Stris & Maher LLP, Cerritos, CA, Michelle C. Yau, Ryan A. Wheeler, Cohen Milstein Sellers & Toll PLLC, Washington, DC, Kai Richter, Cohen Milstein Sellers & Toll PLLC, Minneapolis, MN, *on the brief*), *for Plaintiff-Appellee.*

2

JEREMY P. BLUMENFELD, Morgan, Lewis & Bockius, LLP, Philadelphia, PA, Keri L. Engelman, Morgan, Lewis & Bockius LLP, Boston, MA, (Michael E. Kenneally, Morgan, Lewis, & Bockius LLP, Washington, DC, *on the brief*), *for Defendants-Appellants*.

———

NATHAN, *Circuit Judge*:

When Janet Duke retired, she elected to receive retirement benefits for herself and any surviving spouse. Federal law, pursuant to the Employee Retirement Income Security Act (ERISA), requires those benefits to be equivalent to what Duke would receive if she were unmarried. She also signed a dispute resolution agreement with her former employer subjecting various disputes between them to individual arbitration. Duke now seeks to represent herself and a class of similarly situated retirees, arguing that her pension plan calculated her benefits using unreasonably outdated actuarial assumptions, decreasing her monthly payments relative to what she would have received if she were unmarried at the time of her retirement in violation of ERISA. She also seeks, on behalf of her pension plan, reformation of the plan and repayment from its fiduciaries. Below, the district court held Duke has standing to assert these claims, compelled arbitration of Duke's individual claims, and concluded that the

3

"effective vindication" doctrine precludes individual arbitration of her claims on behalf of the pension plan. The district court also denied Defendants' motion for a mandatory stay of litigation while Duke's individual claims proceed in arbitration. We hold that Duke has standing to seek reformation of the pension plan but not monetary payments to it, that her representative claim is not subject to individual arbitration, and that the district court properly exercised its discretion to deny Defendants' motion for a stay.

## BACKGROUND

### A. Factual Background

Janet Duke worked as a regional manager for Luxottica U.S. Holdings Corp. (Luxottica) for nearly 21 years.[1] That job entitled her to a pension upon retirement, to be paid out of the Luxottica Group Pension Plan (the Plan), managed by the Luxottica Group ERISA Plans Compliance and Investment Committee (the Committee). Because the Plan pays a fixed retirement benefit to participants regardless of the market value of the Plan's assets, it is a "defined benefit plan." *See* 29 U.S.C. § 1002(34)–(35); *see also Hirt v. Equitable Ret. Plan for Emps., Managers, & Agents*, 533 F.3d 102, 104–05 (2d Cir. 2008).

When Duke retired, she had the choice of two types of pension benefits. The first, a single life annuity (SLA), would entitle her—and only her—to a fixed monthly benefit for the rest of her life. The alternative, a joint and survivor annuity (JSA), would entitle her to a fixed monthly benefit for the rest of her life, plus a monthly fraction

---

[1] The facts are drawn from Duke's complaint and presumed true for purposes of resolving this interlocutory appeal.

(i.e., 50% to 100%) of that benefit paid to any surviving spouse for the rest of the spouse's life. The JSA option is the default form of pension benefit for married retirees, and ERISA requires it be the "actuarial equivalent" of a hypothetical SLA that the employee would receive instead. *See* 29 U.S.C. § 1055(d)(1)(B). To comply with ERISA's JSA actuarial equivalence requirement, the Committee employs "actuarial assumptions" to convert the SLA benefit into a JSA benefit. Those assumptions include an interest rate—to measure the changing value of monetary benefits over time—and the anticipated longevity of a plan participant and her spouse.

On November 1, 2016, Duke elected to receive a JSA that would pay 100% of her monthly benefit to any surviving spouse. At the time, the Committee (as fiduciary of the Plan) converted SLAs into JSAs using a 7% annual interest rate and life expectancy values published in 1971. On April 1, 2021, the Committee updated the longevity assumptions it used to perform SLA-JSA conversions.[2] But for JSA participants like Duke whose benefits were calculated before April 1, 2021, the Committee continues to pay benefits based on the SLA-JSA conversion that assumed life expectancy values published in 1971. According to Duke, these outdated assumptions decrease her monthly benefit by roughly $54. She contends, also, that using the outdated assumptions means the Plan is perpetually out of

---

[2] The Committee made this change by guaranteeing to participants whose benefits were calculated after April 1, 2021 that they would receive no less than if the SLA-JSA conversion were performed using updated actuarial assumptions published at 26 U.S.C. § 417.

compliance with ERISA and may suffer follow-on tax consequences as a result.

## B. Procedural History

On November 1, 2021, Duke filed a putative class action complaint against Luxottica, Oakley, Inc. (a subsidiary of Luxottica), the Committee, and the Plan (collectively, Defendants or Appellants), seeking to represent herself and other Plan participants and beneficiaries receiving JSA benefits calculated before April 1, 2021. The complaint asserts four claims: first, a violation of ERISA's JSA equivalence requirement, 29 U.S.C. § 1055(a)–(d); second, a violation of ERISA's equivalence requirement for accrued benefits, *id.* § 1054(c)(3); third, a violation of ERISA's rules prohibiting forfeiture of retirement benefits, *id.* § 1053(a); and fourth, a breach of ERISA's fiduciary duty obligations, *id.* § 1104(a)(1)(A), (B), (D). The purported violation underlying all claims is the same—the Committee's use, before April 1, 2021, of allegedly outdated actuarial assumptions in converting SLAs into JSAs. And for all claims, Duke seeks relief under two of ERISA's remedial provisions—relief on behalf of the Plan, under Section 502(a)(2), *codified at* 29 U.S.C. § 1132(a)(2); and relief on behalf of herself and other Plan participants, under Section 502(a)(3), *codified at* 29 U.S.C. § 1132(a)(3). Most important for present purposes, Duke seeks both reformation of the Plan to update its actuarial assumptions used to convert SLAs into JSAs, as well as monetary restitution to the Plan in the form of loss restoration and disgorgement of profits.[3]

---

[3] The complaint seeks 15 categories of relief, including declaratory relief, injunctive relief, plan reformation, restitution, attorney's fees, and "any

6

Defendants moved to compel arbitration, citing a provision of a Dispute Resolution Agreement (the Agreement) that Duke signed in 2015. In relevant part, the Agreement purports to require arbitration of "disputes . . . arising out of or related to the employment relationship or the termination of that relationship (including post-employment defamation or retaliation), trade secrets, . . . discrimination or harassment and claims arising under the . . . Employee Retirement Income Security Act []except for claims for employee benefits under any benefit plan[.]" Joint App'x 144–45. In particular, Defendants moved to compel *individual* arbitration of Duke's claims, citing the Agreement's class action waiver, which requires that Duke "bring any dispute in arbitration on an individual basis only, and not on a class, collective or private attorney general representative basis on behalf of others." *Id.* 145. Defendants also moved in the alternative to dismiss Duke's claims for lack of standing and for failure to state a claim.

The district court originally granted Defendants' motions in part, concluding that Duke lacks standing to seek relief on behalf of the Plan under Section 502(a)(2), pursuant to *Thole v. U.S. Bank N.A.*, 590 U.S. 538 (2020), and that the parties' Agreement requires individual arbitration of her claims for relief under Section 502(a)(3). *Duke v. Luxottica U.S. Holdings Corp.* (*Duke I*), No. 21-cv-6072, 2023 WL

---

other appropriate equitable relief[.]" Joint App'x 53. On appeal, the parties categorize Duke's requested remedies under Section 502(a)(2) as either plan reformation (via injunction) or repayment to the plan (via restoration of losses or disgorgement of profits). We adopt these conventions in this opinion.

6385389, at *5–6, 11 (E.D.N.Y. Sept. 30, 2023).[4] But after the case was reassigned to a different district court judge and Duke moved for reconsideration, the district court issued a new opinion concluding that Duke has standing to press a claim under Section 502(a)(2) on behalf of the Plan for both reformation and monetary payments to the Plan, and further that the "effective vindication" doctrine precludes mandatory individual arbitration of that claim. *Duke v. Luxottica U.S. Holdings Corp.* (*Duke II*), No. 21-cv-6072, 2024 WL 4904509, at *1, *16 (E.D.N.Y. Nov. 27, 2024). The district court also denied Defendants' alternative request to stay litigation of the claims under Section 502(a)(2) pending arbitration of the claims under Section 502(a)(3), rejecting the argument that such a stay is mandatory under the Federal Arbitration Act (FAA) and finding that its discretion counseled in favor of permitting the claims to proceed simultaneously. *See id.* at *20–22. Defendants timely filed a notice of interlocutory appeal of the denial of the motion to compel arbitration and of the motion to stay. *Cf.* 9 U.S.C. § 16(a)(1)(A)–(B).

## DISCUSSION

We review *de novo* facial challenges to a plaintiff's standing— i.e., challenges "based solely on the allegations of the complaint and

---

[4] The district court deferred ruling on Defendants' argument that Duke lacks standing because, as a factual matter, she stands to lose benefits if the Committee updates the Plan's actuarial assumptions for pre-April 1, 2021 SLA-JSA conversions. *See Duke I*, 2023 WL 6385389, at *7. No party asks us to review this decision, nor must we, in part because a district court "has leeway as to the procedure it wishes to follow" to adjudicate a factual issue underlying a plaintiff's standing. *All. For Env. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 (2d Cir. 2006).

exhibits attached to it." *Sonterra Cap. Master Fund Ltd. v. UBS AG*, 954 F.3d 529, 533 (2d Cir. 2020) (cleaned up).  We also review *de novo* the district court's disposition of the motions to compel arbitration and for a mandatory stay under the FAA.  *See Katz v. Cellco P'Ship*, 794 F.3d 341, 344 n.4 (2d Cir. 2015).

## A. Appellate Jurisdiction

We must begin by assuring ourselves of the Court's jurisdiction over this appeal.  *See Marquez v. Silver*, 96 F.4th 579, 582 (2d Cir. 2024).  In general, our appellate jurisdiction is limited to reviewing final judgments.  *See* 28 U.S.C. § 1291.  Limited exceptions to this rule, however, permit review of certain interlocutory orders, including a district court's denial of motions to compel arbitration and to stay litigation under the FAA.  *See* 9 U.S.C. § 16(a)(1)(A)–(B).  Our jurisdiction to review those aspects of the district court's order is thus plain.  But Appellants ask us to review also the district court's determination that Duke has standing under Article III to seek relief on behalf of the Plan under Section 502(a)(2)—a determination of the district court's subject matter jurisdiction that is not ordinarily immediately appealable.  *Cf. Ashmore v. CGI Grp., Inc.*, 860 F.3d 80, 85 (2d Cir. 2017).  They argue that the FAA's grant of interlocutory appellate jurisdiction extends to this issue, as well.

In general, interlocutory appellate review is limited to the particular decision of the district court that forms the basis for immediate appeal.  *See Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 38 (1995).  That requires we assess the scope of an "order" denying a motion to compel arbitration or for a stay.  *Cf.* 9 U.SC. § 16(a)(1)(A)–(B).  We hold today that such an order includes a district court's

9

determination that it has subject matter jurisdiction over the controversy to be litigated rather than stayed or arbitrated—including a plaintiff's Article III standing.

Several of our precedents support this result. To begin, it is routine practice to review a district court's exercise of subject matter jurisdiction on interlocutory appeal, as "[t]he existence of subject matter jurisdiction goes to the very power of the district court to issue the rulings now under consideration." *Merritt v. Shuttle, Inc.*, 187 F.3d 263, 269 (2d Cir. 1999). Such is the case for interlocutory appeals of grants or denials of preliminary injunctions, *San Filippo v. United Bhd. of Carpenters & Joiners of Am.*, 525 F.2d 508, 512–13 (1975); of denials of sovereign and qualified immunity defenses, *Merritt*, 187 F.3d at 268–69; *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig.*, 488 F.3d 112, 121–24 (2d Cir. 2007); and of adjudications of civil contempt, *U.S. Cath. Conf. v. Abortion Rights Mobilization, Inc.*, 487 U.S. 72, 76 (1998).

We discern no reason that FAA appeals should work any differently, especially because "a district court must determine if there exists a case or controversy in order for it to exercise its jurisdiction over [a] motion to compel [arbitration]." *Doe v. Trump Corp.*, 6 F.4th 400, 416 (2d Cir. 2021) (quoting *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1110 n.19 (11th Cir. 2004)). The same is true for a district court's denial of a motion for a stay of litigation, which is necessarily premised upon its having jurisdiction to preside over the litigation in the first place. Indeed, we have before reviewed a district court's exercise of subject matter jurisdiction in a Section 16(a)(1) appeal of the denial of a motion for an FAA stay, though

10

concededly without stopping to ask whether such an approach comported with *Swint*. *See Adams v. Suozzi*, 433 F.3d 220, 223–26 (2d Cir. 2005).[5]

The crux of Duke's response is that standing is different. We are unpersuaded. A plaintiff's standing, just like the existence of diversity among the parties or a federal-law issue, bears directly on the district court's subject matter jurisdiction. That is because "Article III . . . limits the subject-matter jurisdiction of the federal courts to 'Cases' and 'Controversies.'" *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020). No principled reason exists for treating these two limitations on a district court's power to entertain an action differently in the context of an interlocutory appeal. A defect in either would have required the district court to dismiss the action, and thus

---

[5] The courts of appeals appear divided on this question. The Fifth, Seventh, Eighth, and Ninth Circuits permit reviewing (at least) subject matter jurisdiction on Section 16(a)(1) appeal. *See Hines v. Stamos*, 111 F.4th 551, 558–62 (5th Cir. 2024) (personal jurisdiction); *Nettles v. Midland Funding LLC*, 983 F.3d 896, 899 (7th Cir. 2020) (Article III standing); *Benchmark Ins. Co. v. SUNZ Ins. Co.*, 36 F.4th 766, 770 (8th Cir. 2022) (subject matter jurisdiction); *Namisnak v. Uber Techs., Inc.*, 971 F.3d 1088, 1091–92 (9th Cir. 2020) (Article III standing). The Third Circuit permits interlocutory review of a district court's statutory basis for exercising subject matter jurisdiction but not of a plaintiff's Article III standing. *See O'Hanlon v. Uber Techs., Inc.*, 990 F.3d 757, 762–66 (3d Cir. 2021). The Sixth Circuit has not formally weighed in but has cited *O'Hanlon*'s rule with approval. *See Schnatter v. 247 Grp., LLC*, 155 F.4th 543, 553 (6th Cir. 2025). For the reasons given above, we respectfully disagree with the Third Circuit's approach and hold instead that we may review a plaintiff's standing to assert a claim at issue in a Section 16(a)(1) interlocutory appeal.

"we have an obligation to determine whether the district court has subject matter jurisdiction to go forward." *MTBE*, 488 F.3d at 124.

Finally, were we unsure whether a plaintiff's standing is always reviewable on a Section 16(a)(1) interlocutory appeal, we would nevertheless hold in this case that such review is appropriate because it concerns an issue "inextricably intertwined" with an appealable order. *Cf. Swint*, 514 U.S. at 51. We sometimes refer to this as the doctrine of pendent appellate jurisdiction. *See Freeman v. Complex Computing Co., Inc.*, 119 F.3d 1044, 1049–50 (2d Cir. 1997). We have thus already suggested that, in an interlocutory FAA appeal, we may review a decision that falls outside of Section 16(a)(1) so long it is "inextricably intertwined" with a decision that falls within Section 16(a)(1). *See Milligan v. CCC Info. Servs. Inc.*, 920 F.3d 146, 152 n.5 (2d Cir. 2019). Though the exercise of pendent appellate jurisdiction is discretionary and reserved for "exceptional circumstances," *Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 117 (2d Cir. 2016) (quotation marks omitted), it is warranted here. Duke's standing to seek Section 502(a)(2) remedies bears directly on the arbitrability of her claim under that provision. This is because the district court based its denial of the motion to compel arbitration on the effective vindication doctrine, which precludes enforcing arbitration clauses that "operate as a prospective waiver of a party's right to pursue statutory *remedies*." *Am. Exp. Co. v. Ital. Colors Rest.*, 570 U.S. 228, 235 (2013) (cleaned up and emphasis altered). To determine whether the district court properly applied that doctrine—as we will have to in reviewing its interlocutory decision denying the motion to compel—we must ask which statutory remedies Duke

12

could hope to pursue in federal court. As her Article III standing is central to that inquiry, it is "inextricably intertwined"—even more so than in the typical case—with the district court's immediately appealable order denying the motion to compel arbitration. *Cf. MTBE*, 488 F.3d at 123.

Assured that our jurisdiction permits review of Duke's standing to seek Section 502(a)(2) remedies on behalf of the Plan, we turn next to the requirements of Article III.

## B. Article III Standing

As we have already intimated, Article III "limits the jurisdiction of federal courts to 'Cases' and 'Controversies,'" and by extension requires a plaintiff to satisfy "the irreducible constitutional minimum of standing[.]" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992). Accordingly, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 338 (2016). Though a plaintiff's claimed injury must be redressable, a plaintiff need not state a meritorious or even plausible claim for relief under existing law in order to have standing to pursue a claim. *See Soule v. Conn. Ass'n of Schools, Inc.*, 90 F.4th 34, 45 (2d Cir. 2023). Indeed, unless a requested form of relief that would redress a plaintiff's injury "is so insubstantial, implausible, foreclosed by prior decisions . . . , or otherwise completely devoid of merit as not to involve a federal controversy," *Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 89 (1998) (quotation marks omitted), that it may be legally unavailable is irrelevant for assessing a plaintiff's Article III standing, *Soule*, 90 F.4th

13

at 51. That said, "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

The Supreme Court distilled the application of these requirements to ERISA actions in *Thole*. There, two vested participants in a retirement plan sued the plan's fiduciaries under Sections 502(a)(2) and (a)(3), alleging mismanagement and seeking repayment to the plan, injunctive relief, and removal of the fiduciaries. 590 U.S. at 540–41. Like Duke, the *Thole* plaintiffs were participants in a defined benefit plan, meaning their legal entitlement to monthly benefits did not vary based on the plan's performance or assets; indeed, neither plaintiff alleged that he had received a dollar less than he was owed. *See id.* at 540. The Supreme Court, applying traditional Article III principles, held that the plaintiffs lacked standing to represent the plan, as they suffered no injury that would be redressed by any form of relief they sought on behalf of the plan. *See id.* at 541. The Court rejected various theories of trust-specific standing, holding instead that an ERISA plaintiff—just like any other—must stand to personally benefit from the litigation in order to have standing. *See id.* at 542–43. The Court left open, however, the possibility of standing for plaintiffs who allege mismanagement that "substantially increase[s] the risk that the plan and the employer [will] fail and be unable to pay the participants' future . . . benefits," thereby generating a redressable injury. *See id.* at 546. But the *Thole* plaintiffs made no such allegation, and so they faced no credible chance of future injury. *Id.* Nor did they possess a credible chance at

14

a future benefit, since any surplus in a defined benefit plan's assets return to the employer rather than the participants. *See id.* at 543. Without any hope of financial gain from a successful lawsuit on behalf of the plan, the plaintiffs lacked Article III standing to represent it. *Id.* at 547.

Armed with these principles, Appellants argue that Duke lacks standing to pursue any remedy on behalf of the plan under Section 502(a)(2). We agree in part.

1. Standing to Seek Plan Reformation

First, Appellants argue that Duke lacks standing to pursue plan reformation under Section 502(a)(2). They do not contest, nor could they, that Duke's receipt of decreased benefits constitutes a "classic pocketbook injury" cognizable under Article III. *See Tyler v. Hennepin County*, 598 U.S. 631, 636 (2023); *see also Thole*, 590 U.S. at 542. Appellants also acknowledge that this injury is at least plausibly caused by the Committee's use of allegedly outdated actuarial assumptions, and that it would be remedied by an order requiring the Committee to update those assumptions. *See* Appellants' Br. 24 ("[S]he can seek to change the terms of the Plan and order Defendants to pay Plaintiff higher benefits in accordance with those changed terms."). Instead, Appellants argue that such a remedy is categorically unavailable under Section 502(a)(2)—which authorizes relief only to a plan—and thus Duke's injury is not redressable under that provision. But this argument targets the merits of Duke's claims, not her standing to pursue them. Without deciding whether the reformation Duke seeks is an available remedy under Section

15

502(a)(2), we hold that Duke has standing to seek plan reformation under the provision.

Appellants are generally correct that Section 502(a)(2) authorizes relief to a plan, rather than to participants themselves. *See L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty., Inc.*, 710 F.3d 57, 65–66 (2d Cir. 2013). That limitation flows from the text of ERISA Section 409—incorporated into Section 502(a)(2)—which imposes personal liability on fiduciaries to restore "to the plan" losses caused by and profits made from breaches of fiduciary duty. *See* 29 U.S.C. § 1109(a). And though the same provision also authorizes "other equitable or remedial relief as the court may deem appropriate," *id.*, the Supreme Court soon interpreted that phrase to require the relief sought "protect the entire plan, rather than . . . the rights of an individual beneficiary," *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 141 (1985). The Supreme Court has since walked back the "entire plan" requirement, permitting Section 502(a)(2) claims that are likely to benefit even a single participant, so long as the relief sought would remedy a "plan injur[y]," rather than a purely "individual injur[y]." *See LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008). But as we have explained, though *LaRue* clarified that the availability of Section 502(a)(2) relief does not turn on how widespread a plan injury is, it must nevertheless be to the plan *itself*. *See Cedeno v. Sasson*, 100 F.4th 386, 399 (2d Cir. 2024); *see also Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173, 180 (2d Cir. 2021). For relief from genuinely personal injuries, participants must instead turn to Section 502(a)(3), which authorizes individual equitable relief regardless of the whether the

16

plan has also suffered. *See Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996).

Appellants take these requirements to mean that Section 502(a)(2) offers Duke no remedy, as her Article III injury—reduced benefits—does not harm the Plan. But Duke does not contend that her receipt of reduced benefits harms the Plan. Instead, she argues that the Plan is harmed because its use of allegedly outdated actuarial assumptions renders the Plan in constant noncompliance with ERISA and jeopardizes its favorable tax status as a result.[6] And though the reformation she seeks will allegedly increase her benefits—which is why she has Article III standing—"[i]t is of no moment that recovery inuring to the Plan may ultimately benefit particular participants." *L.I. Head Start*, 710 F.3d at 66. Nor does it matter that "a desire to ensure a defendant's compliance with regulatory law is an insufficient injury for Article III standing," Appellants' Br. 32 (quotation marks omitted), because the Plan's alleged noncompliance is its *own* injury that Duke seeks to remedy with Section 502(a)(2), rather than her receipt of decreased benefits, which *is* sufficient for standing, *see Thole*, 590 U.S. at 542.

---

[6] At argument, Appellants suggested that this type of plan harm is not cognizable because Duke did not allege it in her complaint. The complaint, however, contains several allegations suggesting that the Plan jeopardizes its favorable tax status by failing to comply with ERISA's actuarial equivalence requirement and parallel requirements in the Tax Code. *See* Joint App'x 30–31 ¶¶ 33, 37, 41. Nonetheless, the Court may resolve contested jurisdictional issues by referencing materials outside the pleadings, including the parties' briefs. *See Licci v. Lebanese Canadian Bank, SAL*, 834 F.3d 201, 211 (2d Cir. 2016).

17

Stepping back, whether ERISA noncompliance and attendant tax consequences really do constitute "plan injuries" within Section 502(a)(2)'s remedial scope is an undecided question properly reserved for the merits. We know this in part because Appellants muster no authority foreclosing remedying plan-compliance injuries of this sort under Section 502(a)(2). Instead, Appellants lament that permitting such a remedy "would remove any limit on the relief available under this part of ERISA's carefully crafted enforcement provision." Reply Br. 14. Maybe, but that does not render Duke's position "so insubstantial, implausible, foreclosed by prior decisions . . . , or otherwise completely devoid of merit as not to involve a federal controversy." *Cf. Steel Co.*, 523 U.S. at 89 (quotation marks omitted). Instead, this back-and-forth demonstrates merely that both parties have arguments to make about "the legal availability" of Section 502(a)(2) relief in this case—a dispute that "goes to the merits, not jurisdiction." *Soule*, 90 F.4th at 51. Today, we do not decide whether Duke has adequately alleged a Plan injury that falls within the remedial scope of Section 502(a)(2). We hold only that she has Article III standing to try.

2. Standing to Seek Monetary Payments

Appellants argue next that, whether or not Duke has standing to seek reformation of the Plan, she lacks standing to seek monetary payments to the Plan. Specifically, she seeks repayment of losses to the Plan and disgorgement of profits (which would also go to the Plan). Appellants argue that Duke does not have standing to seek those remedies because only the Plan would benefit from such relief, and Duke herself would not. They argue that *Thole* precludes

18

participants from seeking general monetary recoveries on behalf of a defined benefit plan, so long as the participants have not plausibly alleged a substantial risk of plan and employer failure. *Cf.* 590 U.S. at 546. Here, we agree with Appellants.

Duke attempts to distinguish *Thole* along two lines. First, she argues that the case is different because, unlike her, the *Thole* plaintiffs had received all of their previous benefits. *See* 590 U.S. at 540. But the Supreme Court also explained that, because the plaintiffs were participants in a defined benefit plan, they possessed "no equitable or property interest" in the plan's assets, and so monetary repayment to the plan would not benefit the plaintiffs personally. *See id.* at 543. And though Duke claims to have received decreased benefits in the past, her benefits were allegedly decreased not for a lack of Plan funds, but because of the Plan's use of outdated actuarial assumptions. "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co.*, 523 U.S. at 107.

Second, Duke argues that the forms of relief she seeks will "work in tandem" by increasing Plan funding commensurate with the reformation she hopes to obtain. *See* Appellee's Br. 35. But here again, her argument is foreclosed by *Thole*. Because Duke is a participant in a defined benefit plan, "the employer . . . is on the hook for plan shortfalls." *Thole*, 590 U.S. at 543. Likewise, "the employer, not plan participants, receives any surplus left over after all of the benefits are paid[.]" *Id.* So it may be that the forms of relief she seeks will work together, but nothing suggests monetary payments to the Plan will be *necessary* to effectuate any eventual reformation. In other words, if

19

Duke is successful in seeking reformation, she will be made whole regardless of whether the Plan receives additional funds; and if Duke is unsuccessful in seeking reformation, she will not be made whole regardless of whether the Plan receives those funds. A "favorable decision" on this form of relief will thus not "relieve a discrete injury," *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982), and therefore fails Article III's redressability requirement.[7] We accordingly reverse the district court's determination that Duke has standing to pursue monetary remedies on behalf of the Plan.

## C. Arbitrability Under the Effective-Vindication Doctrine

Appellants' fallback position is that Duke's Section 502(a)(2) claim belongs in individual arbitration pursuant to the Dispute Resolution Agreement Duke signed. Duke responds that the effective vindication doctrine precludes mandatory individual arbitration of her Section 502(a)(2) claim, and even if it did not, the Agreement does not cover her ERISA claims. We agree with Duke's first argument and do not reach her second.

The FAA provides that "a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]" 9 U.S.C. § 2.

---

[7] Duke offered a new theory at argument: that a judgment ordering monetary payments would compel the Committee to adjust its actuarial assumptions on its own. But that would be true of any judgment, and the Supreme Court has made clear that "plaintiffs must demonstrate standing . . . for each form of relief that they seek[.]" *TransUnion*, 594 U.S. at 431.

"Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements[.]" *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). But it is not absolute. Instead, courts may, under the "effective vindication exception" to Section 2, "invalidate, on public policy grounds, arbitration agreements that operate as a prospective waiver of a party's right to pursue statutory remedies." *Am. Exp.*, 570 U.S. at 235 (cleaned up). We have thus held that arbitration provisions requiring individual litigation of Section 502(a)(2) claims are unenforceable because they prospectively waive a plaintiff's right under that provision to bring a representative action to secure remedies on behalf of an ERISA plan. *See Cedeno*, 100 F.4th at 400. This is so in part because Section 502(a)(2) actions *must* be brought in some form of representative capacity because the claim "is inherently representational." *Id.* at 403; *see also Coan v. Kaufman*, 457 F.3d 250, 262 (2d Cir. 2006). To require such claims be brought solely in an individual capacity is to prohibit them altogether. *See Cooper*, 990 F.3d at 184. Our cases, especially *Cedeno*, have straightforward application to this case: Duke may not be compelled to individually arbitrate her Section 502(a)(2) claim on behalf of the Plan.

Appellants strain for ways around these cases. None succeed.

First, Appellants return to Article III standing to argue that *Cedeno* precludes Duke's quest to remedy her supposedly "individual injuries" under Section 502(a)(2). Appellants' Br. 42. Not so. Though we reaffirmed in *Cedeno* the rule that Section 502(a)(2) actions are available only to remedy plan injuries, here Duke has alleged one: systematic noncompliance with ERISA and follow-on tax

21

consequences. *Cedeno* said nothing about whether that theory of plan injury is actionable or not under ERISA, and neither do we on this preliminary posture. Instead, the arbitration provision in that case was unenforceable because it would have, if enforced, deprived the plaintiff of even her "right to *pursue* statutory remedies." *Cedeno*, 100 F.4th at 401 (emphasis added) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985)). Because individual arbitration would "materially interfere with [Duke's] ability to seek relief under" Section 502(a)(2), the effective vindication doctrine precludes its enforcement. *Cf. State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 91 (2d Cir. 2024).

Next, Appellants suggest that *Cedeno* is different because the plaintiff in that case was a participant in a defined contribution plan, rather than defined benefit plan. According to Appellants, this distinction matters because the alleged fiduciary mismanagement in *Cedeno* would harm "both participants and the plan itself by 'saddling the Plan with millions of dollars of debt to the substantial detriment of the Plan and its participants[.]'" Appellants' Br. 43 (alteration adopted). But again, Duke has alleged the same problem—that the Plan's use of outdated actuarial assumptions harms the Plan (through systemic ERISA noncompliance and jeopardy of its favorable tax status) as well as participants (through underpayment of benefits). And Duke will not be able to remedy the Plan's harm on her own, as only a representative action can resolve the allegedly detrimental effects of widespread violations of federal law. "It is of no moment that recovery inuring to the Plan may ultimately benefit particular participants." *L.I. Head Start*, 710 F.3d at 66.

Finally, Appellants argue that reading *Cedeno* to protect Duke's statutory right to pursue a representative Section 502(a)(2) action would run afoul of Supreme Court cases invalidating state laws that provide "a free-floating right to proceed through collective action for its own sake[.]" Appellants' Br. 46 (quoting *Cedeno*, 100 F.4th at 401). It is true that, as a general matter, the mere availability of a representative or class-action procedure is not a substantive right that a plaintiff may invoke to avoid individual arbitration. *See Estle v. Int'l Bus. Machs. Corp.*, 23 F.4th 210, 213–14 (2d Cir. 2022). Accordingly, even if a state purports to require genuinely individual claims be brought in a representative capacity, the Supreme Court has held that such a scheme is a procedural device overridden by the FAA's policy favoring the enforcement of arbitration agreements. *See, e.g.*, *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 659–62 (2022). But as we explained in *Cedeno*, the Supreme Court in that case "recognized a qualitative difference between waivers of collective-action procedures like class actions, and waivers that preclude a party from arbitrating in a representational capacity *on behalf of a single absent principal*[.]" 100 F.4th at 402 (citing *Viking River*, 596 U.S. at 656–58). Thus, Appellants' argument that Duke seeks to escape individual arbitration through the invocation of a representative procedure, like their other arguments, proceeds on the flawed assumption that Duke seeks a personal remedy under Section 502(a)(2). She does not. Instead, she seeks relief for an "absent principal," *Cedeno*, 100 F.4th at 402, that "may ultimately benefit" her, as well, *L.I. Head Start*, 710 F.3d at 66. Whether she succeeds, including whether the alleged systemic ERISA noncompliance and jeopardy to its favorable tax status are

23

plan injuries that can be remedied through Section 502(a)(2), are merits questions beyond the scope of this appeal.

Because Appellants present no persuasive reason for distinguishing *Cedeno*, we hold that it precludes compelling Duke to individually arbitrate her claims under Section 502(a)(2). We do not reach the question whether the Section 502(a)(3) claim falls within the Agreement's arbitration provision, as the FAA removes from our appellate jurisdiction review of a district court's interlocutory order compelling arbitration. *See* 9 U.S.C. § 16(b)(2).

**D. Section 3 Stay of Litigation**

Appellants' final challenge is to the district court's denial of their motion to stay litigation on Section 502(a)(2) pending the parties' arbitration. The district court exercised its discretion to deny the motion, reasoning that Appellants had not demonstrated the extent of factual overlap between arbitrable and nonarbitrable claims or that substantial prejudice would result absent a stay. Appellants do not now contest these conclusions. Instead, they argue only that the district court was without discretion to deny the motion because the stay they sought was mandatory under Section 3 of the FAA. We disagree.

Section 3 of the FAA provides in relevant part:

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an

24

agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement[.]

9 U.S.C. § 3.

Section 3 stays are mandatory, not discretionary. *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024). But Section 3 does not extend to claims not subject to arbitration; whether a district court stays those is "a matter of its discretion to control its docket." *Moses H. Cone*, 460 U.S. at 20 n.23. That is so even for "claims arising out of the same series of events[.]" *Chang v. Lin*, 824 F.2d 219, 222 (2d Cir. 1987), *overruled on other grounds*, *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477 (1989). True enough, "stay orders are particularly appropriate if the arbitrable claims predominate the lawsuit and the nonarbitrable claims are of questionable merit." *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 856 (2d Cir. 1987) (citing *NPS Commc'ns v. Cont'l Grp., Inc.*, 760 F.2d 463, 465 (2d Cir. 1985)). But weighing those considerations is still "within the district court's discretion to control its docket." *Id.*

For their part, Appellants offer *McCowan v. Sears, Roebuck & Co.*, which concerned consolidated actions asserting federal and state securities claims against a brokerage firm (Dean Witter) and a "controlling person" under Virginia law (Sears). 908 F.2d 1099, 1100–01 (2d Cir. 1990). Dean Witter and the plaintiffs had formed an arbitration agreement; Sears and the plaintiffs had not. *Id.* at 1105. After the federal claims were either referred to arbitration or dismissed, Dean Witter and Sears both moved for Section 3 stays of the remaining state law claims, arguing that they fell within the scope

25

of the plaintiffs' arbitration agreement with Dean Witter and that Sears was a third-party beneficiary of that agreement. *Id.* at 1101–02. We held that Dean Witter enjoyed a right to a mandatory stay because the claims against it were within the scope of the parties' agreement. *Id.* at 1107. But we explained that we did "need not determine whether Sears also [had] such a right," because "[t]he practical effect of the stay as to Dean Witter, an indispensable party . . . , [was] that the suit against Sears, which [was] wholly dependent on the claim against Dean Witter, [could not] proceed." *Id.* at 1108.

Unlike Appellants, we do not read *McCowan* to compel a Section 3 stay any time arbitrable and nonarbitrable claims share issues of law or fact. For one thing, it was decided after *Genesco* and *Chang*, which the *McCowan* panel had no authority to overrule. For another, *McCowan*'s holding stemmed from the fact that Dean Witter was an indispensable party in the litigation against Sears but also entitled to a mandatory stay of litigation. *Id.* at 1101. The litigation could thus "[not] proceed" because Dean Witter enjoyed a mandatory right to await the conclusion of arbitration before continuing, and it was indispensable to the litigation going forward. The result had nothing to do with the scope of Section 3. But even if it did, any lesson from that case is confined to its narrow context of a nonarbitrable claim that is *entirely* derivative of an arbitrable one and is stayed as a result. Whatever *McCowan* says about that situation, it would not mandate a stay here, as Duke's requested relief under Section 502(a)(2) is much broader than, and therefore not derivative of, her request under Section 502(a)(3).

26

Finally, Appellants ask us to overlook *Chang* and *Genesco* and rely instead on the word "issue" in Section 3 to hold that the provision mandates a stay any time a litigated claim shares a question of law or fact with a claim to be arbitrated. Even on its own terms, the textual argument faces problems. First, Section 3 says more than the word "issue"; it mandates a stay of an "issue *referable to arbitration*." *See* 9 U.S.C. § 3 (emphasis added). In context, that plainly refers to the *claims* that the district court orders arbitrated, rather than any discrete legal or factual issues that may one day arise in arbitration. Second, as we have already explained, the issue referred to arbitration in this case was Duke's individual entitlement to Section 502(a)(3) relief, *not* the distinct question whether the Plan suffered a qualifying injury redressable under Section 502(a)(2). So even if we could overrule our precedents—which we cannot, *see Garcia Pinach v. Bondi*, 147 F.4th 117, 129 (2d Cir. 2025)—we would not be inclined to adopt Appellants' drastic reading of Section 3.

Because Appellants do not make any other argument that the district court abused its discretion, we affirm its denial of the stay motion.

## CONCLUSION

The district court's November 27, 2024 order is **REVERSED** as to Duke's Article III standing to seek monetary payments on behalf of the Plan and **AFFIRMED** in all other respects.

27